**Electronically Filed
Supreme Court
SCWC-16-0000365
28-FEB-2022
12:20 PM
Dkt. 7 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

JOE CROFFORD,
Petitioner/Plaintiff-Appellee,

vs.

KRISTI ADACHI,
Respondent/Defendant-Appellant.

_____

SCWC-16-0000365

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000365; FC-D NO. 13-1-7625)

FEBRUARY 28, 2022

RECKTENWALD, C.J, NAKAYAMA, McKENNA, WILSON, and EDDINS, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

### I.   INTRODUCTION

At issue is whether marital agreements that consider fault or misconduct when dividing the marital property are enforceable.  The parties entered into a post-marital agreement expressing, among other things, that if Joe Crofford (Husband) engaged in extramarital affairs or physically harmed his wife

Kristi Adachi (Wife), Wife would receive most of the parties' joint assets. Husband contends on certiorari that the agreement is void because it violates Hawai'i's public policy favoring no-fault divorce and equitable distribution of marital property.

We have not previously considered whether marital agreements that account for misconduct or fault when dividing the marital property are enforceable. Upon review, we conclude these agreements are not enforceable.

## II.    BACKGROUND

The parties were married in 1999.[1] At the time of their marriage, Wife owned significant assets, including two homes in Kailua, Hawai'i and a medical practice, Hawaiian Island ENT Specialists, Inc. Husband did not have significant marital assets and owed more than $200,000.00 in past child support for two children from prior marriages. Together, the parties have one child, who was twelve years old when they separated.

Over the course of their marriage, Husband engaged in several extramarital affairs. In March 2013, after Wife found Husband in bed on their yacht with another woman, Wife wanted to file for divorce. Husband pleaded with Wife not to leave the

---

[1]    The parties did not execute a premarital agreement.

marriage and proposed that the parties sign a postnuptial agreement, which Wife agreed to.

In or around May 2013, Wife presented Husband with the first draft of the Marital Agreement, which provided that Husband would receive $200,000 in the event the parties divorced.[2] Husband rejected the first draft and refused to make any edits to it. About two months later, Wife sent Husband a second draft of the Marital Agreement. Husband made handwritten edits to the second draft, but neither party executed the agreement. Instead, the parties drafted a Marital Agreement Addendum (Addendum) to address the issues that Husband lined or struck out in the second draft. The Addendum, which was primarily drafted by Husband, provided as follows:

> I, [Husband] on this date of June 24, 2013 propose this post-nuptial agreement.
>
> I have been married to [Wife] since July 24, 1999. She was the love of my life until I did not feel important to her due to her career. Instead of being the leader of the family in the godly way that I should have been, I acted out because of my sinful nature. I have been unfaithful to my wife on numerous occasions. . . . I desire to break away from my destructive behaviors and truly become the man that our Lord Jesus Christ would want me to be.
>
> . . . .
>
> I ask my wife for forgiveness for all my sins and will uphold my verbal, and now written promise to her regarding agreeing

---

[2] Specifically, the first draft listed the parties' two South Street apartments and their yacht as Wife's separately owned property. Moreover, the draft explained that, "[i]n lieu of any payments of maintenance, spousal support . . . or an interest in [Wife's] separately owned property in the event of a divorce, [Wife] shall pay [Husband] the sum of $200,000.00[.]"

3

> to leave this marriage with honor and dignity <u>without monetary compensation if I a[m] unable [to] change my sinful ways. Specifically, have another affair[,] either emotional or consummated, or physically harm [Wife].</u>
>
> In return, I ask of my wife to give me the [l]ove and [r]espect I so long for and to truly forgive my sins . . . I [also] ask her to spend more time with me[.]

(Emphasis added.)

Additionally, the Addendum addressed the allocation of certain property. It explained:

> The Sunreef 62 foot Catamaran Yacht . . . will remain the property [of Husband] and will be put in [Husband's] trust with [Wife] named as the beneficiary in the event of [Husband's] [d]eath and will remain the property of the trust in the event of a divorce <u>with exception in the case of infidelity and physical harm</u> by [Husband]. At which time the [o]wnership of the Yacht Spartan Queen will be transferred to [Wife].
>
> The Penthouse 4501 located at One Waterfront Towers 415 South St. will remain in [Wife's] [t]rust with [Husband] named as the [b]eneficiary.
>
> In the event of divorce <u>with the exception of infidelity or physical harm</u> by [Husband], [Husband] will maintain ownership of the [yacht], which has been effectively paid in full by [Wife]. All monies invested in the yacht up until November 2012 were contributions directly from money earned through [Wife's] business . . . and will be considered monetary compensation for the years invested in this [m]arriage. [Husband] will waive any separation of property rights; except as described below and alimony.
>
> . . . .
>
> We will also both have to agree on all future financial decisions to secure our financial future together. I accept her proposal to place the proceeds from the sale of apartment 425 South Street in a [t]rust under both of our names. . . . In the event of a divorce, any monies gained or properties invested in will be split equally between the two of us; <u>with the exception of infidelity and physical harm</u>.

(Emphases added.)

Wife executed the Addendum in the presence of a notary public on June 24, 2013 and Husband executed the Addendum in the presence of a notary public the following day. Although Husband contested whether the Marital Agreement itself was properly executed, he acknowledged signing the Addendum.[3]

The parties separated in September 2013 after Husband exhibited aggressive behavior towards Wife. Husband filed his Complaint for divorce on October 7, 2013 and Wife filed her Answer to Complaint for Divorce on November 18, 2013.

A. **Family Court Proceedings**

Following a bench trial, the Family Court of the First Circuit[4] entered its findings of fact and conclusions of law and decree granting absolute divorce and awarding child custody. First, the family court determined that Wife "never coerced or unduly influenced Husband to sign the Addendum." The family court also concluded that the parties entered into the Marital Agreement and Addendum voluntarily, and that Husband violated the infidelity conditions in the Addendum. However, the family court held that the Marital Agreement and Addendum were unenforceable because "the essence of the Marital Agreement [and Addendum] violates the

---

[3]     Both the family court and the ICA concluded that the parties executed the Addendum, which incorporated by reference the second draft of the Marital Agreement. Crofford v. Adachi, 148 Hawai'i 535, 479 P.3d 153, 2020 WL 7775540 at *2, *7 (App. Dec. 30, 2020) (mem. op.).

[4]     The Honorable Darryl Y.C. Choy presided.

5

statutory policy and principles of no fault divorce and equitable distribution." The family court divided the marital property based on what it determined would be just and equitable, rather than as set forth in the parties' marital agreements.[5] The family court relied upon a 2015 tax assessment valuation of the parties' penthouse apartment submitted by Wife, which at $2,454,500, was almost $600,000 less than the value reached by a private appraiser that Husband and Wife jointly hired.

## B.   Proceedings on Appeal

The parties cross-appealed to the ICA. On appeal, Wife argued that the family court erred in rejecting the Marital Agreement and Addendum. Wife argued that "no Hawaii appellate court has ever held . . . that a marital agreement attaching contingencies of fault" renders the agreement unenforceable. Wife explained that

> both the Hawaii appellate courts and courts in other jurisdictions have held that marital agreements in which the parties agree to a certain manner in which to divide and distribute marital property, effective upon one of the parties being unfaithful, are valid and enforceable even if the division of property is not otherwise "equitable," and even in light of public policy favoring no-fault divorces.

(Citing Balogh v. Balogh, 134 Hawai'i 29, 43-45, 332 P.3d 631, 645-47 (2014); In re Marriage of Tabassum & Younis, 881 N.E.2d

_____

[5]      As noted by the ICA, under the Marital Agreement and Addendum, "[Husband] would at minimum receive the Acura MDX and half of the parties' gold and silver." In its findings of fact, the family court valued the Acura MDX at $27,000 and the gold and silver at $174,000.

6

396, 413 (Ill. App. Ct. 2007); Gilley v. Gilley, 778 S.W.2d 862, 864 (Tenn. Ct. App. 1989)).

Husband contended that Hawai'i's "no-fault divorce standards preclude enforcement of the [Addendum]," and allowing Wife "to 'revive' the long deceased, fault-based divorce by contract would frustrate the legislatively-expressed policy that the [f]amily [c]ourt should not waste its limited time and resources attempting to resolve competing claims of marital misconduct." Husband also argued that he signed the agreement involuntarily and that the agreement was unconscionable. Finally, Husband argued that the family court abused its discretion in valuing the parties' penthouse apartment at $2,454,500, based on the property's 2015 tax assessment value, instead of $3,000,000, the value reached by a private appraiser that Husband and Wife agreed to hire.

In a memorandum opinion, the ICA agreed with Wife, and concluded that the family court erred with regard to the Marital Agreement and Addendum's enforceability. The ICA explained that "[a]lthough Hawai'i has implemented a no-fault divorce scheme, there is no law that invalidates a marital agreement because it provides for distribution of marital property based on the conduct of the parties." Crofford v. Adachi, 148 Hawai'i 535, 479 P.3d 153, 2020 WL 7775540 at *5 (App. Dec. 30, 2020) (mem. op.) After

7

noting the family court's finding that both Husband and Wife signed the Addendum and entered into the Marital Agreement by referencing it in the signed Addendum, the ICA concluded that the Marital Agreement and Addendum were valid and enforceable.

Additionally, the ICA disagreed with Husband that the Marital Agreement and Addendum were unconscionable because it awarded almost all joint assets to Wife. Noting that "the [Addendum] only contemplated an inequitable division of property if [Husband] had another affair or physically harmed [Wife]," the ICA found it "unlikely that the Marital Agreement and Addendum would have been construed by the parties as demonstrative of Husband's commitment to the marriage if it had not contained the contingencies of fault and the resulting inequitable distribution of property." Id. at *8 (citing Balogh, 134 Hawai'i at 43, 332 P.3d at 645). The ICA concluded:

> Given [Wife's] contributions to the marriage, all of the circumstances at the time the Marital Agreement and Addendum were entered into, including the reasons for drafting the agreement and the provisions therein, the one-sided distribution of property contemplated by the postmarital agreement in the event [Husband] had another affair or physically harmed [Wife] is not "so outrageously oppressive as to be unconscionable in the absence of unfair surprise."

Id. at *9 (quoting Balogh, 134 Hawai'i at 42-43, 332 P.3d at 644-45).

The ICA additionally held that the agreements were not procedurally unconscionable, finding no evidence of unfair

8

surprise.  The ICA noted that the Husband primarily drafted the Addendum and "there is no evidence that [Husband] did not have full knowledge or the chance to obtain full knowledge of [Wife's] financial circumstances."  Id. at \*10.

Finally, the ICA rejected Husband's other points of error, including his challenges to "various aspects of the family court's valuation of certain real and personal property, debts, and premarital contributions," for failing to comply with the requirements of Hawaiʻi Rules of Appellate Procedure (HRAP) Rule 28(b)(4).[6]  Id. at \*11.  The ICA stated that

> [Husband] fails to specifically address the findings of fact and conclusions of law that he lists in his points of error in his arguments.  We are left to speculate which finding or conclusion [Husband] seeks to address in his arguments, which we decline to do.

Id. at \*11.

The ICA concluded that Husband failed to argue his alleged points of error regarding the family court's findings of fact and conclusions of law, and deemed them to be waived.

The ICA vacated the family court's property division awards and remanded to the family court to "enter a new property

---

[6]     HRAP Rule 28(b)(4) requires an appellant to state "(i) the alleged error committed by the court or agency; (ii) where in the record the alleged error occurred; and (iii) where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency."

division award according to the parties' agreement set forth in the [] Addendum."  Id. at *11.

Husband sought review by this court, raising the following questions in his application for writ of certiorari: (1) whether a court may enforce a marital agreement that is contrary to the no-fault public policy in divorce proceedings; (2) whether the Marital Agreement and Addendum violated Hawai'i's no-fault public policy, thus making it unenforceable; (3) whether the agreements are unconscionable because they award Wife approximately ninety-nine percent of the marital property; (4) whether the family court erred in rejecting the parties' stipulation to the value of the parties' jointly-owned penthouse; and (5) whether marital agreements between spouses should be subject to a higher standard pursuant to the rules governing fiduciary relationships.

### III.  STANDARDS OF REVIEW

**A.  Family Court Decisions**

"[T]he family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion."  Kakinami v. Kakinami, 127 Hawai'i 126, 136, 276 P.3d 695, 705 (2012) (citations omitted).

## B.    Findings of Fact and Conclusions of Law

> The family court's findings of fact are reviewed under the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. The family court's conclusions of law are reviewed de novo.

Balogh, 134 Hawai'i at 38, 332 P.3d at 640 (quoting Kakinami, 127 Hawai'i at 136, 276 P.3d at 705) (internal quotation marks omitted).

## C.    Construction of a Marital Agreement

> The construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court. Unconscionability is a question of law this court reviews de novo. Whether particular circumstances are sufficient to constitute . . . duress is a question of law, although the existence of those circumstances is a question of fact.

Id. at 37-38, 332 P.3d at 639-40 (citations, brackets and internal quotation marks omitted).

## IV.    DISCUSSION

## A.    The Marital Agreement and Addendum are Contrary to Public Policy

### 1.    Hawai'i has adopted a no-fault approach to divorce proceedings, which extends to the division of marital property

In 1972, the legislature amended Hawai'i Revised Statutes (HRS) § 580-41 (2018), the statute governing divorce proceedings, to eliminate the requirement that a party filing for

divorce show marital misconduct on the part of their spouse.[7]  At a House Judiciary Committee hearing, Family Court Judge Betty Vitousek offered the following rationale in favor of no-fault divorce: "Unnecessary disputes over fault, where one party to the divorce action must be the accuser and the other the accused, lead to counter-spouse antagonism which, particularly when the parties have children, further aggravates their differences."  H. Stand. Comm. Rep. No. 1172, in 1972 House Journal, at 637.  As amended, HRS § 580-41 now mandates that divorce is appropriate "upon the application of either party" if the court finds:

> (1)  The marriage is irretrievably broken;
>
> (2)  The parties have lived separate and apart under a decree of separation from bed and board entered by any court of competent jurisdiction, the term of separation has expired, and no reconciliation has been effected;
>
> (3)  The parties have lived separate and apart for a period of two years or more under a decree of separate maintenance entered by any court of competent jurisdiction, and no reconciliation has been effected; or
>
> (4)  The parties have lived separate and apart for a continuous period of two years or more immediately preceding the application, there is no reasonable likelihood that cohabitation will be resumed, and the court is satisfied that, in the particular circumstances of the case, it would not be harsh and oppressive to the defendant or contrary to the public interest to a divorce on this ground on the complaint of the plaintiff.

---

[7]    The previous iteration of HRS § 580-41 provided that "[d]ivorces from the bond of matrimony shall be granted for the causes hereinafter set forth and no other," and provided an exhaustive list of reasons related to fault.  1970 Haw. Sess. Laws Act 116, § 1 at 223.

HRS § 580-41.[8]

Even before the legislature's enactment of Hawai'i's no-fault divorce policy, however, this court had already held that a person's conduct during the marriage was irrelevant to the division of marital property. See Richards v. Richards, 44 Haw. 491, 509, 355 P.2d 188, 198-99 (1960) ("Personal conduct of the spouses toward each other is material to the establishment of a ground for divorce. But it has no bearing on the question as to which spouse has a better claim to the property sought to be divided in a divorce proceeding." (emphasis added)). And following Richards, our courts have continued to hold that fault should not be considered in the division of marital property upon divorce. See, e.g., Hatayama v. Hatayama, 9 Haw. App. 1, 11-12, 818 P.2d 277, 282 (1991) (holding that the parties' relative contributions during marriage did not authorize a deviation from an equal division of marital property); Gordon v. Gordon, 135 Hawai'i 340, 353, 350 P.3d 1008, 1021 (2015) (holding, inter alia, that husband's "financial misconduct during the marriage should not have been considered by the family court when deciding whether to deviate from an equal division of marital partnership property in the absence of a finding of extraordinary circumstances").

---

[8]     HRS § 580-41 has remained unchanged as amended. See 1972 Haw. Sess. Laws Act 11, § 1 at 165-66.

In <u>Hatayama</u>, the ICA specifically construed Hawaiʻi's no-fault approach to divorce to include the principle that parties' contributions and conduct during marriage are generally irrelevant to the division of marital assets upon divorce:

> <u>Divorce is not a vehicle by which one spouse is compensated for having given more than he or she received during the marriage or for having had to suffer during the marriage</u> from the other spouse's inadvertent, negligent, or intentional inadequacies, failures, or wrongdoings, financial or otherwise. . . . If such evidence was relevant, each spouse would be well-advised to prepare from the date of the marriage for the possibility of a divorce by meticulously keeping score in a daily diary. The trial would be a contest of diaries and experts. <u>Allowing it to be such a vehicle would be contrary to the public policy in favor of loving, trusting, harmonious marriages and no-fault divorces</u>.

<u>Hatayama</u>, 9 Haw. App. at 11-12, 818 P.2d at 282 (emphases added).

In this way, our courts have recognized that Hawaiʻi's no-fault divorce policy extends to disputes over how marital property should be divided.

2. **The Marital Agreement and Addendum violate Hawaiʻi's no-fault divorce policy by requiring that the family court make a determination of whether one party engaged in misconduct**

As a general rule, postnuptial agreements between spouses are valid in Hawaiʻi. See HRS § 572-22(c) (Supp. 2019) ("All contracts made between spouses, whenever made . . . and not otherwise invalid because of any other law, shall be valid."); <u>Balogh</u>, 134 Hawaiʻi at 32, 332 P.3d at 634 (affirming a married couple's right to contract). However, as with any other contract,

14

a postnuptial agreement must be made for a lawful purpose and must not be contrary to public policy.  See, e.g., Yin v. Aguiar, 146 Hawai'i 254, 270, 463 P.3d 911, 927 (2020) ("When evaluating the validity of [contract] clauses, we examine whether they violate public policy." (cleaned up)).  Public policy "may . . . derive from numerous sources including constitutional provisions, statutory provisions, or the common law."  Id. at 270, 463 P.3d at 927 (emphasis added).

The ICA here cited Balogh and its general affirmation of marital contracts to hold that the Marital Agreement and Addendum were valid and enforceable.  In Balogh, following a period of marital tension, husband and wife signed two agreements stating that "if they separated, [wife] would receive seventy-five percent of the profit from the sale of the property, the contents of their home . . . , all of their vehicles, and $100,000 from [husband] in lieu of alimony and court proceedings."  Balogh, 134 Hawaiʻi at 32, 332 P.3d at 634 (emphasis added).[9]  On appeal, we concluded that the parties' handwritten agreement was enforceable and the family court "must enforce all valid and enforceable postmarital and separation agreements."  Id. at 40, 332 P.3d at 642 (citing Epp v. Epp, 80 Hawai'i 79, 87, 905 P.2d 54, 62 (App. 1995)).

---

[9]     Significantly, the agreement in Balogh was contingent on separation, not misconduct, and did not necessitate a balancing of the spouses' interest in contracting against Hawai'i's policy of no-fault divorce.

15

Citing Balogh, the ICA in this case held that the parties' marital agreement, which was "freely entered into," should override the mandate of Hawai'i's no-fault divorce scheme that spousal conduct be disregarded in determining the division of marital assets. Crofford, 2020 WL 7775540 at *5. The ICA reasoned that

> Although Hawai'i has implemented a no-fault divorce scheme, there is no law that invalidates a marital agreement because it provides for the distribution of marital property based on the conduct of the parties. Rather, given the explicit provisions of HRS § 572-22, and as recognized by the supreme court, spouses may contract regarding marital property rights in premarital, postmarital, or settlement agreements, and the family court must enforce all valid and enforceable agreements with regard to marital property division.

Id. at *5 (emphasis added) (citing Balogh, 134 Hawai'i at 39 n.4, 332 P.3d at 641 n.4).

Respectfully, we disagree with the ICA's application of Balogh to this case. Unlike the agreement in Balogh, the Marital Agreement and Addendum here are contingent on the conduct of the parties, necessitating a determination of whether one party engaged in misconduct. Although, in this case, Husband did not contest that he violated the terms of the agreement, if he did, the family court would have had to consider the parties' evidence of alleged fault in determining whether the agreement was violated. Such a result would conflict with the legislature's interest in "avoid[ing] abrasive evidence in divorce proceedings,"

16

S. Stand. Comm. Rep. No. 415, in 1971 Senate Journal, at 971, and turn the parties' divorce trial into the "contest of diaries and experts" denounced by the ICA in Hatayama. 9 Haw. App. at 11-12, 818 P.2d at 282.

In conclusion, the ICA erred in holding that the Marital Agreement and Addendum here are valid and enforceable. Because the agreements require the family court to make determinations of fault, they violate Hawai'i's policy of no-fault divorce. We therefore hold that the agreements are void and unenforceable.

3. **Case law from other jurisdictions supports that the agreements here are void and unenforceable as a matter of public policy**

Although jurisdictions are split on whether postnuptial agreements that premise property division on a spouse's infidelity violate the public policy of no-fault divorce, a number of states have held that such agreements are void or unenforceable as a matter of public policy. For example, in In re Marriage of Cooper, the parties entered into a reconciliation agreement after wife learned husband was having an extramarital affair. 769 N.W.2d 582 (Iowa 2009). The agreement, which was signed and notarized, provided that husband would "accept full responsibilities [for his] action" in the event his "indiscretions le[d] to" a divorce, and required that husband make payments and provide for certain financial arrangements in the event of

17

divorce. Id. at 584. Soon thereafter, husband left the marital home, moved to his own apartment, and admitted he continued his prior affair even after signing the reconciliation agreement. Id. The Iowa Supreme Court concluded that this agreement violated Iowa's public policy, stating that "[a] unifying theme of our historic case law is that contracts which attempt to regulate the conduct of spouses during the marital relationship are not enforceable." Id. at 586. In order to avoid "empower[ing] spouses to seek an end-run around [its] no-fault divorce laws through private contracts," id. at 587, and "creat[ing] a bargaining environment where sexual fidelity or harmonious relationships are key variables," id. at 586, the court held that the agreement in Cooper was void.

The reasoning of Cooper is instructive here. Like the agreement in Cooper, the Marital Agreement and Addendum here have "as a condition precedent the sexual conduct of the parties within the marital relationship." Id. at 586. And like Iowa's no-fault divorce law, which was "designed to limit acrimonious proceedings," id. at 587, Hawai'i's divorce statutes were crafted with the purpose of "avoid[ing] abrasive evidence in divorce proceedings." See Stand. Comm. Rep. No. 415, in 1971 Senate Journal, at 971. Despite these similarities, the ICA here distinguished Cooper by arguing that Iowa courts have broader

discretion than Hawai'i courts in accepting or denying a parties' marital agreement.  Crofford, 2020 WL 7775540 at *6.  The ICA pointed out that unlike the Iowa Supreme Court, which recognized that "[t]here is no provision of Iowa statutory law that expressly authorizes or prohibits enforcement of reconciliation agreements," see Cooper, 769 N.W.2d at 585, this court has expressly recognized a married couple's right to "contract regarding marital property rights" under HRS § 572-22.  Crofford, 2020 WL 7775540 at *5 (citing Balogh, 134 Hawai'i at 39 n.4, 332 P.3d at 641 n.4).

HRS § 572-22 does not specifically address whether an agreement that allows marital couples to consider fault in the separation of their property is unenforceable because it contravenes Hawai'i's no-fault approach to divorce proceedings. However, HRS § 572-22 does expressly limit the enforceability of marital contracts to those "not otherwise invalid because of any other law."  The ICA therefore erred in holding that HRS § 572-22 authorized the enforcement of the agreements here.  In this case, the family court would have to determine whether, under the agreements' terms and contrary to the purpose of the no-fault statute, Husband truly "change[d] [his] sinful ways."  Moreover, the court would have to evaluate whether Wife's promises to forgive him and spend more time with him were fulfilled.  Because the Marital Agreement and Addendum here require the family court

19

to evaluate the parties' fault, the agreements are contrary to Hawai'i's no-fault divorce policy and must be voided.

California has also concluded that marital agreements with infidelity clauses are unenforceable. In Diosdado v. Diosdado, 118 Cal. Rptr. 2d 494 (Cal. Ct. App. 2002). There, a California appellate court concluded that a provision in a marital agreement providing payment of liquidated damages to one spouse if the other was "sexually unfaithful" was unenforceable.[10] Id. at 494. The facts in Diosdado are similar to those here: After learning husband was having an affair, the parties entered into a written marital settlement agreement. Id. at 494-95. After signing the agreement, husband was again unfaithful and the parties separated. Id. at 495-96. The court concluded that enforcement of the agreement would require that the court "penalize the party who is at fault for having breached the obligation of sexual fidelity, and whose breach provided the basis for terminating the marriage. This penalty is in direct

---

[10] The ICA distinguished this case for similar reasons as it did Cooper. The ICA noted that "there does not appear to be any California statute similar to HRS § 572-22" and that the California Supreme Court instead relied on a statute requiring a contract to have a "lawful object." Crofford, 2020 WL 7775540 at *6. But, as with Cooper, this difference, although significant, does not answer the question of whether Hawai'i public policy renders the agreement invalid.

contravention of the public policy underlying no-fault divorce."[11] Id. at 496.

Here, the Addendum stated, among other things, that Husband would leave the marital home "without monetary compensation" if he was "unable [to] change [his] sinful ways." Similar to the liquidated damages provision in Diosdado, enforcing the Addendum would require that the court "penalize the party who is at fault for having breached the obligation of sexual fidelity, and whose breach provided the basis for terminating the marriage." Diosdado, 118 Cal. Rptr. 2d at 496.

Finally, Nevada also rejects marital agreements that consider fault or marital misconduct in the division of property. In Parker v. Green, No. 73176, 2018 WL 3211974 (Nev. June 25, 2018), the Nevada Supreme Court addressed a marital agreement expressing that "[husband] would pay [wife] $2,500 per month,

---

[11]  The California Supreme Court had previously rejected the idea that married couples have absolute freedom of contract in a case involving the enforceability of baseball player Barry Bonds' prenuptial agreement. See In re Marriage of Bonds, 5 P.3d 815 (Cal. 2000). Significantly, Diosdado quoted the following passage from Bonds:
> [M]arriage itself is a highly regulated institution of undisputed social value, and there are many limitations on the ability of persons to contract with respect to it . . . that have nothing to do with maximizing the satisfaction of the parties or carrying out their intent. . . . These limitations demonstrate further that freedom of contract with respect to marital arrangements is tempered with statutory requirements and case law expressing social policy with respect to marriage.

Diosdado, 118 Cal. Rptr. 2d at 497 (quoting In re Marriage of Bonds, 5 P.3d at 829-30) (emphasis added).

until death or remarriage, if the parties permanently ended their relationship based on [husband's] infidelity or dishonesty." Id. at *1. The court construed the contract as providing the wife alimony in the event the parties separated, and nonetheless held, "just as infidelity is not an appropriate consideration for divorce, it is also an inappropriate consideration when determining an alimony award." Id. at *3 (citing Rodriguez v. Rodriguez, 13 P.3d 415, 418 (Nev. 2000)).

Other courts have, however, enforced marital agreements that account for misconduct when dividing marital property. In Laudig v. Laudig, 624 A.2d 651 (Pa. Super. Ct. 1993), husband and wife entered into a postnuptial agreement after husband learned of wife's infidelities. The agreement provided, among other things, that if wife engaged in sexual intercourse with anyone other than husband within a period of fifteen years, wife would "sign all of her right, title and interest in and to any marital property . . . to [husband] in consideration for the payment of the sum of Ten Thousand ($10,000.00) Dollars and the sum of One Thousand ($1,000.00) Dollars each and every year thereafter for the following fifteen years." Id. at 652. Wife again was unfaithful, and the husband sought to enforce the postnuptial agreement during the divorce proceedings. The Superior Court of Pennsylvania held that "[o]ne of the recognized purposes of marital agreements is to

22

allow the parties to avoid the operation of equitable distribution," and "[m]arital agreements allow parties to dispose of their property rights regardless of the reasons . . . . If such property rights can be transferred without providing any reason to support the transfer, there should be no reason why a transfer would be invalid if it be conditioned on the occurrence of a specified type of conduct."  Id. at 655.  The Superior Court of Pennsylvania thus rejected wife's argument that the agreement was unenforceable because it violated Pennsylvania's public policy.  However, since Pennsylvania allowed married couples to file for divorce based on fault, id. at 652, the court's reasoning in Laudig is less persuasive in a no-fault state such as Hawai'i.

Similarly, Tennessee has held that marital agreements that account for misconduct in the division of property are enforceable.  In Gilley v. Gilley, the Court of Appeals of Tennessee concluded that a reconciliation agreement executed after wife learned husband was having an affair did not violate Tennessee's public policy favoring the preservation of marital relations.  778 S.W.2d 862, 862 (Tenn. Ct. App. 1989).  The reconciliation agreement "provided that in the event of divorce husband would convey to wife his interest in a corporation owned by the parties."  Id. at 863.  Husband argued that the agreement was unenforceable because it violated Tennessee's public policy

23

favoring the "preservation of marital relations" and the equitable division of property.  Id. at 864.  The court disagreed, and instead concluded that the reconciliation agreement was intended "to encourage marital fidelity on the part of the husband by setting forth, prior to reconciliation, the outcome of a divorce should one occur."  Id.  However, this case is not persuasive because the public policy considerations that husband raised pertained to the "preservation of marital relations," not a no-fault approach to divorce proceedings.

Although the jurisdictions that have considered this issue are split, those courts that have found such agreements unenforceable have policies and divorce schemes that resemble our own.  California and Iowa have both adopted strong policies favoring a no-fault approach to divorce proceedings.  Moreover, we have previously adopted California's approach to the enforceability of prenuptial agreements.  See L.R.O. v. N.D.O., 148 Hawai'i 336, 350, 475 P.3d 1167, 1181 (2020) (citing with approval In re Marriage of Bonds, 5 P.3d 815 (Cal. 2000)).  And, although not dispositive, case law from this jurisdiction generally supports the elimination of fault in the division of property.  See Richards, 44 Haw. at 509, 355 P.2d at 198-99; Horst v. Horst, 1 Haw. App. 617, 624, 623 P.2d 1265, 1271-72 (1981).  While those cases did not involve a marital agreement – and

therefore did not consider a marital couple's right to contract under HRS § 572-22 - they nonetheless reinforce Hawai'i's strong policy favoring no-fault divorce proceedings, including when dividing marital property. Prior caselaw thus supports that the Marital Agreement and Addendum are unenforceable, and that the ICA erred by holding otherwise.

Since we reject the Marital Agreement and Addendum on public policy grounds, we decline to opine on whether the agreements were also substantively or procedurally unconscionable.

B.  **Husband's Additional Challenges on Appeal are Meritless**

After finding that the Marital Agreement and Addendum were unenforceable, the family court considered the value of the marital assets when separating the parties' assets in a just and equitable manner under HRS § 580-74. In doing so, the family court rejected the parties' private appraisal submitted to the court valuing the parties' penthouse property at $3,000,000. Instead, the family court valued the penthouse at the tax-assessed value of $2,454,500. Husband's contention that the family court erred in doing so is without merit.

The family court "possesses wide discretion" when determining the value of marital assets. Kakinami, 127 Hawai'i at

25

136, 276 P.3d at 705.  In this case, the family court found that the parties mutually agreed to hire a private appraiser, that they did not agree to be bound by the resulting appraisal,[12] and that they did not include the appraisal in their exhibits or admit it into evidence.  In light of these findings, which Husband does not challenge here,[13] the family court acted within its discretion in relying upon the penthouse's tax-assessed value of $2,454,500.

Finally, Husband argues that this court should adopt the dissent's reasoning in Balogh, and hold that the "confidential relationship between spouses should require [postmarital] contracts to be subjected to a fiduciary standard to protect spouses against self-dealing and overreaching by the more dominant spouse."  134 Hawai'i at 54, 332 P.3d at 656 (Pollack, J. dissenting).  Because we hold that the Marital Agreement and Addendum violate public policy and are therefore unenforceable, we need not consider whether such a heightened standard is necessary.

---

[12]     Wife had testified at trial that "[t]here's no agreement or stipulation they were agreeing to the appraised value."

[13]     The ICA held that Husband failed to argue and therefore waived his points of error regarding the family court's findings.  On appeal, Husband does not argue that this was in error.

## V. CONCLUSION

For the foregoing reasons, the ICA's February 3, 2021 Judgment on Appeal is vacated.  This case is remanded to the family court for further proceedings consistent with this opinion.

Michael A. Glenn
for petitioner

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

/s/ Todd W. Eddins



27