*Thomas L. Lloyd v. Anna Cristina Niceta*, No. 33, September Term, 2022. Opinion by Hotten, J.

**FAMILY LAW – POSTNUPTIAL AGREEMENTS – LIQUIDATED DAMAGES CLAUSES** – The Supreme Court of Maryland held that a liquidated damages framework did not apply to postnuptial agreements and was inappropriate for evaluating a $7 million lump sum provision that, as applied in this case, triggered if the husband engaged in adultery. In non-marital contracts, liquidated damages operate as "a sum that will compensate the nonbreacher . . . in lieu of the compensatory contract damage[s] to which the nonbreacher would otherwise be entitled[.]" *Barrie Sch. v. Patch*, 401 Md. 497, 513, 933 A.2d 382, 392 (2007) (cleaned up). In divorce proceedings, parties are not entitled to compensatory damages. Instead, the primary monetary sums available to aggrieved spouses are alimony, child support, and a division of marital property, including a potential monetary award, attendant to divorce. *See* Md. Code Ann., Family Law ("Fam. Law") §§ 1-201(b)(2), (4), (9), 8-205(a)(1). None of those monetary sums serve as compensatory damages for which liquidated damages may substitute. Additionally, liquidated damages cannot serve as a substitute for non-monetary relief, such as annulment, divorce, custody, or visitation. *See* Fam. Law § 1-201(b)(3)–(6). Marital agreements may alter the outcome of divorce, but this Court has never held that provisions in a marital agreement may substitute for the statutory remedy of divorce. *See Nouri v. Dadgar*, 245 Md. App. 324, 359, 226 A.3d 797, 818 (2020).

**FAMILY LAW – POSTNUPTIAL AGREEMENTS – PUBLIC POLICY – ADULTERY** – The Supreme Court of Maryland held that the public policy in Maryland currently supports provisions in postnuptial agreements that distribute marital assets upon divorce when a spouse engages in adultery. The jurisdictions that have rejected adultery penalties or transfers of marital assets based on adultery have done so because those provisions violate no-fault divorce laws. *See, e.g.*, *Diosdado v. Diosdado*, 118 Cal. Rptr. 2d 494, 496 (2002) (rejecting an adultery penalty because it contravenes California's public policy of no-fault divorce); *In re Marriage of Cooper*, 769 N.W.2d 582, 587 (Iowa 2009) (rejecting allocation of marital assets based on adultery in Iowa); *Crofford v. Adachi*, 150 Haw. 518, 526, 506 P.3d 182, 190 (2022) (rejecting allocation of marital assets based on adultery in Hawai'i). Those decisions are not persuasive regarding the public policy in Maryland because this State: (1) currently permits divorce based on fault, including adultery; and (2) requires courts to consider "the circumstances that contributed to the estrangement of the parties[,]" such as adultery, when issuing a monetary award following divorce. Fam. Law §§ 7-103(a)(1), 8-205(b)(4); *Ohm v. Ohm*, 49 Md. App. 392, 410, 431 A.2d 1371, 1381 (1981). These statutes establish that Maryland's public policy disfavors adultery. That public policy supports spouses transferring marital assets based on adultery when it causes the dissolution of a marriage.

**FAMILY LAW – POSTNUPTIAL AGREEMENTS – ALLOCATION OF MARITAL ASSETS UPON DIVORCE BASED ON ADULTERY** – The Supreme Court of Maryland upheld the enforceability of a provision in a postnuptial agreement that, as applied in this case, required the husband to transfer to his wife $7 million up to the value of his share of specified marital assets if the parties divorced after he engaged in adultery.  Fam. Law § 7-103(a)(1) permits spouses to file for divorce on the grounds of adultery, which supports provisions that distribute assets based on that conduct.  The lump sum provision did not restrict Petitioner's ability to foster his platonic relationships.  The provision would not trigger based on Respondent's mere suspicions because she was required to establish "by a preponderance of the evidence" that Petitioner had engaged in adultery.  Petitioner alone controlled whether the provision would trigger.  The provision only applied to Petitioner's 50% share of specified marital assets, which prevented Respondent from pursuing Petitioner's non-marital assets in the event his 50% share fell below $7 million.

Circuit Court for Montgomery County
Case No.: 165376FL
Argued: June 1, 2023

IN THE SUPREME COURT

OF MARYLAND*

No. 33

September Term, 2022

THOMAS L. LLOYD

v.

ANNA CRISTINA NICETA

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

Opinion by Hotten, J.

Filed: August 30, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

\* During the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

A foundation of many marriages is the vow that spouses will, for better or for worse, remain faithful to one another. We hold that Maryland law allows spouses to allocate marital assets in a postnuptial agreement based on whether a spouse engaged in adultery, thereby causing the breakdown of the marriage.

On October 23, 2019, Anna Cristina Niceta ("Respondent") filed a Complaint for Absolute Divorce in the Circuit Court for Montgomery County against Thomas L. Lloyd ("Petitioner") on the grounds of adultery. Respondent requested that the circuit court incorporate the parties' postnuptial agreement ("Agreement") into the divorce decree, which included a $7 million lump sum provision that would trigger if Petitioner engaged in adultery and related acts. Petitioner filed a countercomplaint, seeking, in relevant part, to rescind the Agreement based on public policy and unconscionability. The circuit court determined that the lump sum provision was an enforceable penalty. On October 8, 2021, the circuit court issued a Judgment of Absolute Divorce, which incorporated, but did not merge, the Agreement. Both parties timely appealed to the Appellate Court of Maryland.[1] *Lloyd v. Niceta*, 255 Md. App. 663, 671, 284 A.3d 808, 813 (2022). The Appellate Court affirmed the circuit court's decision and remanded for further proceedings on issues not before this Court. *Id.*, 284 A.3d at 813. Petitioner timely sought review in this Court.

---

[1] During the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

We granted *certiorari* to address the following questions, which we have rephrased for the sake of clarity:[2]

1. May spouses include a provision in a postnuptial agreement that distributes marital assets upon divorce based on adultery?

2. Is a lump sum provision valid and enforceable when it required a husband to transfer to his wife $7 million, up to the value of his 50% share of specified marital assets, if he committed adultery?

We conclude that the answer to both questions is "yes" and affirm the Appellate Court of Maryland. We explain below.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.      Underlying Factual Background.**

Petitioner and Respondent were married on March 25, 2006 in the District of Columbia. Both parties have college degrees. Respondent was employed as an event planner and served as the White House Social Secretary between February 2017 and January 2021, earning between $130,000 and $200,000 per year. Petitioner was a wealth manager who earned between $70,000 and $122,000 per year. Petitioner has a wealthy

---

[2] The original questions presented in the Petition for Writ of Certiorari were:

1. Are penalties in postnuptial contracts void, just as penalties in all other contracts are void?

2. If there is no blanket ban on penalties in postnuptial contracts, is the penalty in the parties' contract void?

*Elsberry v. Stanley Martin Companies, LLC*, 482 Md. 159, 165 n.1, 286 A.3d 1, 4 n.1 (2022) ("This Court has discretion to rephrase questions presented." (citation omitted)).

family, including his paternal grandmother, Rachel Mellon, who left him a substantial inheritance after she passed away in March 2014.[3]

On June 2, 2014, Respondent discovered that Petitioner was involved in an extramarital affair. The parties separated. Although Respondent was "uncertain if she wanted to remain in the marriage[,]" the parties worked toward "build[ing] trust" and ascertaining the reason for Petitioner's infidelity. The parties consulted a priest and a therapist beginning in the late summer. Upon Respondent's request, Petitioner: (1) provided her with the passwords to his financial and email accounts; (2) transferred a portion of his inheritance into an account held with Respondent as tenants by the entirety; (3) converted to Catholicism; (4) sold the car he had used with his affair partner; and (5) underwent a vasectomy. During the autumn of 2014, Respondent introduced the idea of a postnuptial agreement to Petitioner. Thereafter, the parties each retained two attorneys to prepare the Agreement. Petitioner retained Deborah Cochran, Esq., an estate law attorney, and Julie Day, Esq., a family law attorney. Respondent retained Alison Noll, Esq., an estate law attorney, and Ann Luu, Esq., a family law attorney.

In April 2015, Respondent forwarded a draft of the Agreement to Petitioner. The Agreement contained, in relevant part, a lump sum clause that would require Petitioner to pay Respondent a sum of $5 million if he engaged in adultery and related acts. On June 16, 2015 and July 16, 2015, the parties and their attorneys reviewed the draft "line by

---

[3] Petitioner received his inheritance in two installments. He received the first installment of $5.3 million upon Ms. Mellon's death. Petitioner received the second installment of $5.4 million when he turned forty in May 2016.

3

line[]" during extensive meetings. Petitioner proposed a $2 million increase to the lump sum provision to demonstrate "his good faith toward" Respondent and because he anticipated that he would inherit approximately $12 million from his father's estate. Respondent agreed to the change, and the parties signed the finalized Agreement on September 18, 2015. The lump sum provision provides, in relevant part:

10. **<u>LUMP SUM MONETARY AWARD</u>**.

A. This provision shall only be effective only in the limited situation that any one of the following conditions are satisfied:

(i) If Husband is found by a preponderance of the evidence to have committed adultery, buggery or sodomy with any person;

\*　　\*　　\*

(iii) If Husband is found by a preponderance of the evidence to have engaged in any Inappropriate and/or Immoral Conduct of the following with any other person, including, but not limited to: inappropriate emails; sexting; sending pornographic pictures of himself to the other person; receiving pornographic pictures of the other person; romantically kissing, hugging, fondling, or embracing another person; keeping secret email, cell phone or credit card accounts; or engaging in sexual acts with another person even if it does not lead to intercourse.

B. If Wife proves by a preponderance of the evidence that Husband has engaged in any of the conduct as set forth above in subparagraph 10.A, Husband shall make a tax-free transfer to Wife of SEVEN MILLION AND 00/100 DOLLARS ($7,000,000.00) within ninety (90) days of such findings. If the parties remained married, said transfer shall be a permanent gift between husband and wife; if the parties divorce, this transfer shall constitute a lump sum monetary award not subject to taxation under the terms of the Internal Revenue Code. The transfer shall be made from Husband's 50% share of the Column B Assets.

4

The Agreement included a chart listing Column A Assets, which were assets in accounts that only Petitioner owned, and Column B Assets, which were assets in accounts owned jointly by the parties. Under the Agreement, Petitioner agreed to transfer certain assets that had been Column A Assets to become Column B Assets, converting them from Petitioner's sole property into marital property. Column B Assets included "separate funds" that Petitioner received from: (1) both installments of his inheritance from Ms. Mellon; and (2) "all [other] liquid assets [that Petitioner] inherit[ed] during the marriage[.]" Per the Agreement, Petitioner would deposit those liquid assets into a specified account or, if that account no longer existed, "into another brokerage account titled in the names of both parties as tenants by the entirety with the common law rights of survivorship." Once deposited, the funds, "including all investments or reinvestments of, subsequent accounts, increases in value and income and proceeds from such assets[,]" would be "treated as marital property . . . for as long as the parties [were] married." Pursuant to the distribution scheme under Paragraphs 4(C) and 5(A)(i) of the Agreement, the parties would "equally divide" the Column B assets upon divorce.[4]

---

[4] Paragraph 4(C) requires the parties to "equally divide all assets" pertaining to Petitioner's inheritance from his grandmother "within sixty (60) days from the date of entry of the Final Order of Divorce. Thereafter, each party waive[d] any and all rights they may have, had or may have in the future to the assets so transferred, except as provided [in the Agreement]." Paragraph 5(A)(i) provides the same distribution procedures regarding "all liquid assets [that Petitioner] inherit[ed] during the marriage" other than the assets listed in Paragraph 4(C).

After the parties entered into the Agreement, Petitioner engaged in another extramarital affair in October 2018. The parties separated on April 14, 2019, after Petitioner advised Respondent that he no longer wished to remain married to her.

## II. Proceeding in the Circuit Court for Montgomery County.

On October 23, 2019, Respondent filed a Complaint for Absolute Divorce in the Circuit Court for Montgomery County on the grounds of adultery. She requested that the circuit court incorporate the Agreement into the divorce decree and enforce, among other things, the lump sum provision. Petitioner filed an Answer and Counterclaim, arguing that the Agreement was void because it was unconscionable and against public policy. Petitioner also asserted that the lump sum provision constituted an unenforceable penalty because it was an excessive liquidated damages clause.

The circuit court held several merits hearings between November 23, 2020 and December 9, 2020, where witnesses testified regarding the lump sum provision. Respondent testified that she "did not calculate" the initial $5 million provision. She further testified that the Agreement memorialized Petitioner's promise to remain faithful and that its terms "put [Petitioner's] money where [his] mouth [was]." Respondent asserted that she accepted the $2 million increase to the provision because Petitioner had proposed it.[5] Anthony Joseph Delvecchio, Petitioner's friend, described the lump sum provision as

---

[5] Petitioner testified that Respondent coerced him into proposing the $2 million increase to the lump sum provision because "she believed that $5 million was insufficient[.]" Petitioner claimed that Respondent intended for the provision to leave him "broke" if he "ever cheated on her again[.]" In Petitioner's view, Respondent "didn't want to propose [the increase] herself because she wanted it to come from [him] as a way of showing good faith and . . . it would reflect better on the situation if it" did not come from

"a bad boy clause[.]" In an email to Petitioner, Ms. Day also described the lump sum clause as "the bad boy clause." Ms. Day testified that she had advised Petitioner against agreeing to the lump sum provision. In Ms. Day's view, the lump sum provision "was intended to . . . be prohibitive so that [Petitioner] would not engage in those behaviors again, because he would know there was $5 million out there." Ms. Day further testified that Petitioner wished to increase the provision to $7 million to "make it that much more clear that he really wouldn't engage in those behaviors again," and "as a showing of good faith[.]" Ms. Day referred to the lump sum provision as a "penalty" during negotiations "because that's what it looked like to [her] at that point." She asserted, however, that the term "penalty" "was not a legal term of art."

On January 15, 2021, the circuit court determined that the lump sum provision constituted a penalty,[6] but was enforceable. The circuit court relied on *McGeehan v. McGeehan*, 455 Md. 268, 298, 167 A.3d 579, 596–97 (2017) (citation omitted), where this Court noted that "many postnuptial agreements attempt to use financial rewards and penalties to create incentives during a marriage that constrain the behavior of both spouses." In the circuit court's view, *McGeehan* stood for the proposition that spouses may include adultery penalties in postnuptial agreements. The circuit court observed that the jurisdictions that have rejected adultery penalties have held that those provisions

---

her. The circuit court rejected these assertions and found that Petitioner entered the Agreement free of duress, undue influence, or coercion.

[6] Although the parties disputed whether the lump sum provision constituted a penalty under a liquidated damages framework, the circuit court did not mention liquidated damages during its oral ruling or in its written orders.

undermine no-fault divorce laws in those states.[7]  The circuit court found those cases unpersuasive because "Maryland remains a fault-based state[.]"

The circuit court determined that, although "the decision to agree to the $7 million penalty may have been improvident," the penalty was not unconscionable.  The circuit court noted that the lump sum provision would likely be unconscionable if an individual "with a net worth of $50,000, earning $40,000 per year[]" had agreed to the provision.  The circuit court explained that this "is not the situation here[,]" because the Petitioner had retained approximately $5.3 million in assets pursuant to the Agreement and anticipated a $12 million inheritance from his father's estate when the parties had entered the Agreement.  The circuit court concluded that Petitioner "took on the risk that he would not receive the inheritance from his father's estate, and the risk that he would not commit adultery in the future."  The circuit court memorialized its ruling in an order dated February 11, 2021.  The circuit court issued a Judgment of Absolute Divorce on October 8, 2021, which incorporated, but did not merge, the Agreement.  Both parties timely appealed to the Appellate Court of Maryland.  *Lloyd*, 255 Md. App. at 671, 284 A.3d at 813.

## III.        Proceeding in the Appellate Court of Maryland.

The Appellate Court of Maryland affirmed the circuit court's decision and remanded for further proceedings regarding child support.[8]  *Id.*, 284 A.3d at 813.  Petitioner argued,

---

[7] The circuit court considered decisions from California and Iowa, but did not identify specific cases in its oral ruling.

[8] In her cross-appeal, Respondent argued that the circuit court erred because it declined to address the issue of child support.  *Lloyd*, 255 Md. App. at 700, 284 A.3d at

8

in relevant part,[9] that the lump sum provision violated public policy and constituted an unenforceable penalty. *Id.* at 696, 284 A.3d at 828. Petitioner reasoned that the lump sum provision was a punitive liquidated damages clause and was "disproportionate to any damages that might have resulted from a breach." *Id.*, 284 A.3d at 828. Petitioner claimed that the lump sum provision was unconscionable "because he could not pay the $7 million at the time the Agreement was entered into and because the provision created an environment of fear and coercion in the marriage." *Id.* at 699, 284 A.3d at 829. Respondent "disagree[d] that the lump sum provision constitute[d] liquidated damages because it was not intended to compensate her for damages she would sustain for breach of the Agreement." *Id.* at 696, 284 A.3d at 828. Respondent, however, conceded that the provision was a penalty and argued that such provisions were permissible in postnuptial agreements "to discourage certain behaviors . . . that may damage the marital relationship." *Id.* at 696–97, 284 A.3d at 828.

The Appellate Court held that penalty provisions are permissible in postnuptial agreements because such agreements are designed to discourage and penalize conduct that would undermine a marriage, such as adultery. *Id.* at 698, 284 A.3d at 829. The Appellate Court found *McGeehan* instructive, particularly this Court's explanation that "many

---

830. The Appellate Court agreed and remanded for further proceedings on that issue. *Id.* at 701, 284 A.3d at 830–31. That issue is not before this Court.

[9] Petitioner also challenged the Agreement's validity based on lack of consideration, unconscionability, and undue influence grounds. *Lloyd*, 255 Md. App. at 679, 284 A.3d at 818. The Appellate Court rejected those arguments. *Id.* at 682–84, 690, 695–96, 284 A.3d at 820–21, 824, 827–28. Those issues are also not before this Court.

postnuptial agreements attempt to use financial rewards and penalties to create incentives during a marriage that constrain the behavior of both spouses." *Id.*, 284 A.3d at 829 (citation omitted). In the Appellate Court's view, *McGeehan* "clearly stated" that "post-nuptial agreements designed to discourage certain behavior[s] are not void as a matter of public policy." *Id.*, 284 A.3d at 829. The Appellate Court reasoned that the "public policy prohibition against penalties . . . does not apply with the same rigidity in the context of post-nuptial agreements[,]" because Maryland's "public policy generally frowns on adultery, and postnuptial agreements by their very nature may be viewed as penalizing[.]" *Id.*, 284 A.3d at 829. The Appellate Court observed that "the Agreement in no way required [Petitioner] to stay married to [Respondent]." *Id.* at 699, 284 A.3d at 829.

The Appellate Court also held that the lump sum provision was not unconscionable because Petitioner "alone was the trigger of the penalty[.]" *Id.* at 700, 284 A.3d at 830. The Appellate Court agreed with the circuit court's reasoning that Petitioner accepted the risk that he would not receive an inheritance from his father's estate and that he would not engage in further adultery. *Id.* at 699, 284 A.3d at 830. The Appellate Court observed that, "[w]hile such a provision might create fear, it could . . . create stability and peace in a marriage because the consequences of various actions in a marriage are explicitly spelled out." *Id.* at 700, 284 A.3d at 830. Petitioner timely appealed to this Court. We granted *certiorari* on February 23, 2023. *Lloyd v. Niceta*, 482 Md. 733, 290 A.3d 602 (2023).

**STANDARD OF REVIEW**

Where an action has been tried without a jury, this Court "review[s] the case on both the law and the evidence." Md. Rule 8-131(c). This Court "will not set aside the judgment

10

of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* This Court reviews *de novo* a lower court's interpretation of a contract, as well as its interpretation and application of Maryland statutory and case law. *Clancy v. King*, 405 Md. 541, 556–57, 954 A.2d 1092, 1101 (2008); *Mayor & City Council of Balt. v. Thornton Mellon, LLC*, 478 Md. 396, 410, 274 A.3d 1079, 1087 (2022) (citation omitted).

## PARTIES' CONTENTIONS

### I. Petitioner's Opening Brief.

Petitioner argues that penalty provisions contravene the common law rule against "contractual penalties, [which] allow[s] only liquidated damages clauses designed to reasonably approximate actual damages." Petitioner contends that the General Assembly has not statutorily authorized penalty provisions in marital contracts, which requires this Court to enforce common law principles under Article 5 of the Maryland Declaration of Rights.[10] In Petitioner's view, this Court has never expressly endorsed penalty provisions in marital contracts and this Court's "passing reference" to penalties in postnuptial agreements in "*McGeehan* did not authorize" such provisions. Petitioner asserts that "[j]udicial dabbling in coercive penalties in family law is a dangerous idea[,]" because such penalties would exacerbate spousal abuse.

---

[10] Article 5 provides, in relevant part: "That the Inhabitants of Maryland are entitled to the Common Law of England . . . according to the course of that Law, and to the benefit of such of the English statutes as existed on [July 4, 1776.]" Md. Const. Decl. of Rts. art. 5.

## II.    Respondent's Brief.

Respondent counters that the lump sum provision was not a penalty; rather it was a monetary award that "was intended to deter conduct that . . . was detrimental to the marriage by providing a different distribution of assets in the event [Petitioner] was at fault in the breakdown of the marriage."  Respondent highlights that jurisdictions with fault-based divorce laws, as Maryland is currently, have enforced adultery provisions, while only jurisdictions with no-fault divorce laws have prohibited similar provisions.  Respondent contends that Petitioner "attempts to minimize the *McGeehan* holding by mischaracterizing the cited language as a 'passing reference[.]'"  Respondent claims that Maryland courts should not restrict spouses' free will to voluntarily enter valid agreements that further the public's interest in "promot[ing] compromise and marital harmony, [as well as] minimiz[ing] litigation."[11]

---

[11] Respondent argues that Petitioner "fails to acknowledge in his Brief [] that the parties were residing in Virginia when the Agreement was negotiated."  Respondent cites *Hall v. Hall*, No. 2021-04-4, 2005 WL 2493382 (Va. Ct. App. Oct. 11, 2005), an unreported decision from the Court of Appeals of Virginia, for the proposition that provisions that allocate marital assets based on adultery are enforceable.  Petitioner argues that Respondent is barred from relying on a choice of law argument based on an unreported decision from Virginia, which has no precedential value in that jurisdiction.  This Court "apprais[es] the persuasive value of unreported opinions from other jurisdictions[]" based on "the value of th[o]se opinions in their local courts."  *See MAS Assocs., LLC v. Korotki*, 465 Md. 457, 479 n.11, 214 A.3d 1076, 1088 n.11 (2019).  As Petitioner asserts, unreported decisions in Virginia have no precedential value, and so this Court will not consider *Hall* in its analysis.  Va. Code Ann. § 17.1-413 (stating that only reported decisions "hav[e] precedential value or . . . significance for the law[.]").  To the extent Respondent's arguments raise choice of law concerns, they are not before this Court.  *See* Md. Rule 8-131(b)(1) ("[T]he Supreme Court [of Maryland] ordinarily will consider only an issue that has been raised in the petition for certiorari . . . and that has been preserved for review by the Supreme Court.").

**III.     Petitioner's Reply Brief.**

Petitioner asserts that Respondent's attempt to reframe the lump sum clause as a "monetary award" falls outside this Court's scope of review under Md. Rule 8-131(b)(1). Petitioner emphasizes that both lower courts determined that the provision was a penalty and that Respondent conceded that the provision constituted a penalty during her arguments before the Appellate Court.  Petitioner maintains that the $7 million penalty exceeds the value of the marital estate, which is the most the circuit court could have awarded under the Marital Property Act, Md. Code Ann., Family Law ("Fam. Law") § 8-205.[12]  Petitioner contends that, even if *McGeehan* endorsed penalties in postnuptial agreements, the penalty in this case "constrained only [his] behavior[,]" rather than "the behavior of both spouses."

## ANALYSIS

**I.     Postnuptial Agreements in Maryland.**

> **A.     *The meaning of* McGeehan's *description of penalties.***

The parties dispute whether this Court's description of penalties in *McGeehan* constitutes binding precedent or dicta.  Dicta is "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential[.]"  *Dictum*, *Black's Law Dictionary* (11th ed. 2019).  In

---

[12] Fam. Law § 8-205(a)(1) authorizes the circuit court to, in relevant part, "grant a monetary award . . . as an adjustment of the equities and rights of the parties concerning marital property," after considering several factors, including "the circumstances that contributed to the estrangement of the parties[,]" Fam. Law § 8-205(b)(4).

13

*McGeehan*, this Court resolved whether an oral postnuptial agreement excluded certain properties from consideration as marital property under Fam. Law § 8-201(e)(3)(iii).[13] 455 Md. at 269–70, 167 A.3d at 580. This Court stated, without holding, that "many postnuptial agreements attempt to use financial rewards and penalties to create incentives during a marriage that constrain the behavior of both spouses." *Id.* at 298, 167 A.3d at 596–97 (citation omitted). As Petitioner contends, this description constitutes dicta because *McGeehan* did not involve the validity of penalties in postnuptial agreements. This dicta, however, accurately describes the law in Maryland.

We adopt that dicta as holding and clarify it below. *See Kulikov v. Baffoe-Harding*, 215 Md. App. 193, 204, 79 A.3d 995, 1001 (2013) (converting dicta into holding); Judith M. Stinson, *Why Dicta Becomes Holding and Why It Matters*, 76 Brook. L. Rev. 219, 262 (2010) (recommending "courts [to] expressly identify when they are relying on dicta and explain why they find it persuasive."). The term "penalties," as used in *McGeehan*, refers to provisions that operate to the detriment of a party, rather than provisions that punish a party for breach of contract under liquidated damages principles. Here, the lump sum provision required Petitioner to transfer $7 million up to the value of his 50% share of specified marital assets. That provision operated as a "penalty" under *McGeehan* because it would change Petitioner's financial position to his detriment if he engaged in adultery, thereby causing the breakdown of the parties' marriage.

---

[13] "'[M]arital property' does not include property . . . excluded by valid agreement[.]" Fam. Law § 8-201(e)(3)(iii).

B.      *Postnuptial agreements generally.*

Under Maryland law, spouses "may make a valid and enforceable deed or agreement that relates to alimony, support, property rights, or personal rights."  Fam. Law § 8-101(a). A postnuptial agreement is a type of marital contract "that sets forth the rights, duties and responsibilities of the parties during and upon termination of the marriage through death or divorce."  *McGeehan*, 455 Md. at 297, 167 A.3d at 596 (cleaned up).  Spouses generally enter a postnuptial agreement "at a time when separation or divorce is not imminent." *Postnuptial Agreement*, *Black's Law Dictionary* (11th ed. 2019).  Postnuptial agreements "encourage the private resolution of family issues[,]" because "they may allow couples to eliminate a source of emotional turmoil—usually, financial uncertainty—and focus instead on resolving other aspects of the marriage that may be problematic."  *Bedrick v. Bedrick*, 300 Conn. 691, 698, 17 A.3d 17, 24 (2011).

A postnuptial agreement is valid and enforceable, unless the agreement is unconscionable or the byproduct of fraud, duress, mistake, or undue influence.  *McGeehan*, 455 Md. at 298, 167 A.3d at 597 (citation omitted).  A spouse who challenges the validity of a postnuptial agreement may shift the burden of proof onto the agreement's proponent by establishing the existence of a confidential relationship.  *See Blum v. Blum*, 59 Md. App. 584, 595, 477 A.2d 289, 294 (1984) (noting a party challenging a separation agreement bears the burden of establishing a confidential relationship); *see also Hale v. Hale*, 74 Md. App. 555, 566, 539 A.2d 247, 252 (1988) (same).  Postnuptial agreements allow spouses to alter their default rights under the Family Law Article, subject to the court's equitable authority.  *See Nouri v. Dadgar*, 245 Md. App. 324, 359–60, 226 A.3d 797, 818 (2020)

(noting that spouses may enter into a postnuptial agreement that relinquishes their default statutory rights to marital property).  Courts evaluating a postnuptial agreement may enforce its terms "by power of contempt" when the provisions "are merged into a divorce decree[,]" or "as an independent contract not superseded by the divorce decree[.]"  Fam. Law § 8-105(a)(1)–(2).  Absent countervailing equitable considerations, courts will enforce the terms of a marital agreement to the extent they concern spouses and not children.  *See* Fam. Law § 8-103(a) ("The court may modify any provision of a[n] . . . agreement . . . with respect to the care, custody, education, or support of any minor child of the spouses, if the modification would be in the best interests of the child.").

## II.      The Appropriate Framework for the Lump Sum Provision.

### A.      *The doctrine of liquidated damages is inapplicable to postnuptial agreements.*

Petitioner characterizes the lump sum provision as a penalty because, in his view, it is an excessive liquidated damages provision.  We reject Petitioner's interpretation because the principles governing liquidated damages provisions are incongruent with divorce law and, therefore, provide an inadequate framework for evaluating the lump sum provision.  As we explain in the next section, the lump sum provision is better viewed as an allocation of marital assets based on a party's conduct that led to the estrangement of the parties.  *See* Fam. Law § 8-205(b)(4) (permitting courts to consider "the circumstances that contributed to the estrangement of the parties[]" when fashioning a monetary award following divorce).

Liquidated damages provisions, as applied in non-marital contracts, provide for "a specific sum stipulated to and agreed upon by the parties at the time they entered into a

16

contract, to be paid to compensate for injuries in the event of a breach of that contract."

*Barrie Sch. v. Patch*, 401 Md. 497, 507, 933 A.2d 382, 388 (2007) (citation omitted). A valid liquidated damages clause: (1) must unambiguously provide for a specified sum; (2) must reasonably compensate a party "for the damages anticipated by the breach[;]" and (3) "may not be altered to correspond to actual damages determined after the fact[.]" *Bd. of Educ. of Talbot Cnty. v. Heister*, 392 Md. 140, 156, 896 A.2d 342, 352 (2006) (cleaned up). A liquidated damages provision will be construed as a penalty when the parties intend for the sum to punish the breaching party or when the sum is "grossly excessive and out of all proportion to the damages that might reasonably have been expected to result from such breach of the contract." *Patch*, 401 Md. at 508, 933 A.2d at 389 (cleaned up). Contract law rejects penalties because "[t]he central objective behind the system of contract remedies is compensatory, not punitive." Restatement (Second) of Contracts § 356 cmt. a (1981).

We agree with Petitioner that the lump sum provision would constitute an unenforceable penalty had the Agreement been a traditional common law contract, rather than a marital contract.[14] The Agreement arose following Petitioner's infidelity, which

---

[14] We recognize that, "[i]n its broadest sense, a[] [marital] agreement is, of course, a [common law] contract." *See Cannon v. Cannon*, 384 Md. 537, 553, 865 A.2d 563, 572 (2005). The distinction between a "traditional" common law contract and a marital contract lies, in relevant part, in the available remedies for breach of contract, which we discuss further below. *Compare* Restatement (Second) of Contracts § 346 cmt. a (1981) ("[A] judgment awarding a sum of money as damages is the most common judicial remedy for breach of [a traditional common law] contract[.]") *with* Fam. Law §§ 8-101, 8-105(a)(1), 8-205(a)(1) (empowering family courts to enforce marital agreements regarding "alimony, support, property rights, or personal rights[,]" and limiting any monetary award in divorce proceedings to the value of marital property).

established a backdrop for negotiations. The Agreement provided that any further act of infidelity would require payment of the $7 million lump sum, thus deterring Petitioner from engaging in conduct that was repugnant to the marriage. Ms. Day's testimony supports this interpretation because she stated that the lump sum provision "was intended to [] be prohibitive . . . so that [Petitioner] would not" commence another extramarital affair. Additionally, Ms. Day and Mr. Delvecchio both referred to the lump sum provision as the "bad boy clause." That phrase implied that the operation of the lump sum provision would compel Petitioner to comport himself or face a consequence. Therefore, the record demonstrates that the parties intended for the lump sum provision to deter Petitioner from engaging in adultery again and, if the deterrent did not work, to reallocate marital assets to reflect his responsibility for the breakdown of the marriage.

Petitioner contends that this Court's inquiry should end here because marital agreements are governed by the same principles as common law contracts, which prohibit penalties. We disagree. We recognize that "[t]he general principles governing other types of contracts apply to" marital agreements. *Bruce v. Dyer*, 309 Md. 421, 439, 524 A.2d 777, 786 (1987) (citations omitted). This approach, however, does not prohibit this Court from deviating from common law contract principles when they are incongruent with principles governing marital contracts. *See, e.g.*, *McGeehan*, 455 Md. at 294, 167 A.3d at 594 ("*Unlike other contracts*, . . . a confidential relationship exists between the parties, as a matter of law[,] in an antenuptial agreement." (cleaned up) (emphasis added)). Indeed, marital "agreements are necessarily infused with equitable considerations and are construed in light of salient legal and policy concerns[,]" which may occasionally render

18

"normal tenets of contract interpretation" inapplicable. *Holtham v. Lucas*, 460 N.J. Super. 308, 319–20, 214 A.3d 1226, 1232 (App. Div. 2019) (cleaned up).

Petitioner's position presumes that the doctrine of liquidated damages and, by extension, the rule against penalties, apply to marital agreements. This is because liquidated damages provisions and penalties exist on a spectrum of enforceability, and one doctrine cannot be imported into family law without the other. *See Patch*, 401 Md. at 510, 933 A.2d at 390 (noting that the boundary between liquidated damages clauses and penalties is "one of the most difficult and perplexing inquiries encountered in the construction of written agreements[.]" (cleaned up)). We hold that such a framework is ill-suited for marital agreements.

In non-marital agreements, liquidated damages operate as "a sum that will compensate the nonbreacher for any harm caused by the breach, *in lieu of the compensatory contract damage*[*s*] *to which the nonbreacher would otherwise be entitled*[.]" *Id.* at 513, 933 A.2d at 392 (cleaned up) (emphasis added). In divorce proceedings, parties are not entitled to compensatory damages. Instead, the primary monetary sums available to an aggrieved spouse are alimony, child support, and a division of marital assets, including a potential monetary award, attendant to divorce, which are statutory remedies and subject to the court's equitable authority.[15] *See* Fam. Law §§ 1-201(b)(2), (4), (9) ("An equity court has jurisdiction over: . . . (2) alimony; . . . (4) divorce; . . . (9) support of a child[.]"),

---

[15] Parties may also recover litigation costs, subject to the court's discretion. *See* Fam. Law § 7-107(e) (providing that parties may seek "reimbursement for any reasonable and necessary expense" incurred during litigation).

8-205(a)(1) (authorizing courts to "grant a monetary award, . . . as an adjustment of the equities and rights of the parties concerning marital property[.]"). None of those monetary sums serve as compensatory damages for which liquidated damages may substitute. Additionally, liquidated damages cannot serve as a substitute for non-monetary relief, such as annulment, divorce, custody, or visitation. *See* Fam. Law § 1-201(b)(3)–(6). Marital agreements may "alter the presumptive consequences of" divorce, but this Court has never held that provisions in a marital agreement may substitute for the statutory remedy of divorce. *See Nouri*, 245 Md. App. at 359, 226 A.3d at 818 (citations omitted). We decline to do so in this case.

Additionally, as a practical matter, applying a liquidated damages framework would place this Court in the untenable position of assigning a dollar value to a marriage for purposes of evaluating when a liquidated damages provision becomes a penalty. *See Patch*, 401 Md. at 508–09, 933 A.2d at 388–89 (explaining that a liquidated damages provision operates as a substitute for ordinary contractual remedies); Restatement (Second) of Contracts § 346 cmt. a (1981) ("[A] judgment awarding a sum of money as damages is the most common judicial remedy for breach of contract[.]"). Even if this Court were inclined to try to make such a calculation, any measure of damages would be speculative. The speculative nature of damages undermines a liquidated damages framework because liquidated damages must "provide a fair estimate of potential damages[.]" *See Patch*, 401 Md. at 510, 933 A.2d at 390 (citations omitted). Accordingly, we decline to apply a liquidated damages framework in evaluating the lump sum provision in this case.

Treating provisions in marital agreements as penalties under a liquidated damages framework would also undermine the goals of marital agreements. Courts in other jurisdictions have rejected doing so even when faced with provisions that more clearly resemble traditional contract penalties. The Superior Court of New Jersey, Appellate Division's decision in *Holtham* is instructive. In that case, a husband challenged a marital settlement agreement that required him to pay off an automobile loan and transfer title of that automobile to his wife. *Holtham*, 460 N.J. Super. at 314, 214 A.3d at 1229. The agreement imposed a $150 fee for each day that the husband failed to comply. *Id.*, 214 A.3d at 1229. The trial court incorporated the agreement into the parties' divorce decree and ordered the husband to pay $18,450 pursuant to the agreement. *Id.*, 214 A.3d at 1229. On appeal, the Superior Court of New Jersey, Appellate Division "agree[d] that $18,450 would constitute an unenforceable penalty under traditional contract law principles," but held that "the penalty rule does not apply with equal force to marital settlement agreements embodied in final divorce judgments." *Id.*, 214 A.3d at 1229.

The court considered the policies underlying the penalty rule, which "protect[ed] against both oppression and . . . recovery that far exceed[ed] the economic losses normally recoverable for breach of contract." *Id.* at 320, 214 A.3d at 1232–33 (citations omitted). In the court's view, the penalty rule was incompatible with marital contracts because it "fail[ed] to account for non-market-based 'idiosyncratic value'" or "recognize the premium that the court and parties place on post-divorce peace." *Id.* at 321, 214 A.3d at 1233 (citations omitted). The court explained that "[t]he penalty rule also does not account for the fact that parties to matrimonial agreements may behave far differently than the rational

21

economic actors presumed to participate in typical contractual relationships." *Id.* at 322, 214 A.3d at 1233. The court observed that, unlike common law contracts, marital agreements "are necessarily infused with equitable considerations and are construed in light of salient legal and policy concerns." *Id.* at 319, 214 A.3d at 1232 (cleaned up). The court concluded that "a per diem fee that may fail as a penalty under traditional contract principles may reasonably deter or remedy the emotional harm caused by a breach of post-marital peace." *Id.* at 322, 214 A.3d at 1233.

Similarly, the Appellate Court of Connecticut upheld a penalty provision in a separation agreement that required a husband to pay his wife an additional 10% annual interest if he failed to timely pay her approximately $15 million over two installments. *Dougan v. Dougan*, 114 Conn. App. 379, 381, 970 A.2d 131, 134 (2009), *aff'd on other grounds*, 301 Conn. 361, 21 A.3d 791 (2011). The court declined to apply the rule against penalties because the state had an interest in spouses entering into agreements that "conserve[] judicial resources and encourage[] private resolution of family issues." *Id.* at 385, 970 A.2d at 136–37. The court noted that "the parties were both represented by counsel, [] reached an agreement after a long negotiation period, . . . participated actively in the negotiations[,] and found the agreement fair, reasonable[,] and in line with their expectations." *Id.* at 387–88, 970 A.2d at 138.

Unlike economic and arms-length transactions between business entities, transactions between spouses involve a marriage, which "is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred." *Obergefell v. Hodges*, 576 U.S. 644, 667, 135 S. Ct. 2584, 2599 (2015) (cleaned up). The intimacy of

marriage and the equitable considerations in divorce proceedings undermine the economic-based rationale of the rule against penalties because spouses have an emotional stake in ensuring their marriage endures or, in the alternative, securing their future following divorce. *See Holtham*, 460 N.J. Super. at 322, 214 A.3d at 1233 (noting that parties to a marital agreement "may behave far differently than the rational economic actors presumed to participate in typical contractual relationships.").

Postnuptial agreements offer a vehicle through which spouses may: (1) memorialize their commitment to each other by deterring conduct that is repugnant to their marriage; (2) resolve their marital disputes without judicial intervention; and (3) financially secure their post-divorce future, particularly where one spouse is culpable for the failure of the marriage. *See McGeehan*, 455 Md. at 298, 167 A.3d at 596–97 (noting that postnuptial agreements may incorporate "financial rewards and penalties to create incentives during a marriage that constrain the behavior of both spouses." (citation omitted)); *see also Bedrick*, 300 Conn. at 698, 17 A.3d at 24 ("Postnuptial agreements may also encourage the private resolution of family issues[,]" thereby "eliminat[ing] a source of emotional turmoil . . . and [allowing spouses to] focus instead on resolving other aspects of the marriage that may be problematic.").

Assuming, *arguendo*, that the lump sum provision was akin to a traditional contractual penalty provision, we would not agree that it should be governed by principles of liquidated damages. As we explain further in the next section, the term "penalty," as used in a liquidated damages framework, is inapplicable to postnuptial agreements. Accordingly, the issue before this Court is best framed as whether a provision in a

23

postnuptial agreement may allocate marital assets based on one party committing adultery, thereby being primarily responsible for the breakdown of the marriage. Maryland statutory law enshrines the ability of spouses to mold their marriage, as well as the consequences of any divorce, through agreements. *See* Fam. Law § 8-101(a). Embedded in that statutory right is the power for spouses to include interspousal transfers of marital assets based on adultery in their postnuptial agreements.

B. *The lump sum provision is akin to a transfer of marital property upon divorce under Fam. Law § 8-101(a) based on adultery.*

The lump sum provision is properly understood as an interspousal distribution of marital assets that is contingent upon infidelity as the cause of the breakdown of the marriage. We note that the Agreement describes the provision as either a "permanent gift" or "a lump sum monetary award[,]" depending on whether the parties divorced. This provision memorializes Respondent's contingent interest in $7 million from Petitioner's "50% share of the Column B Assets[,]" *i.e.*, marital assets, in exchange for her forbearance of filing for divorce on the grounds of adultery following Petitioner's initial extramarital affair. *See Blumenthal v. Heron*, 261 Md. 234, 243, 274 A.2d 636, 640 (1971) (noting that forbearance from bringing a legal claim constitutes valid consideration). Respondent contends that the lump sum provision is not a penalty, but a "monetary award[.]" In this context, we agree.

Fam. Law 8-205(a)(1) provides that, after determining which property is marital property and the value of that property, "the court may . . . grant a monetary award . . . as an adjustment of the equities and rights of the parties concerning marital property[.]" Fam.

24

Law 8-205(b) then identifies eleven factors a court is required to consider in determining, in relevant part, "the amount and the method of payment of a monetary award[.]" One of those factors is "the circumstances that contributed to the estrangement of the parties[.]" Fam. Law § 8-205(b)(4). Thus, the Family Law Article expressly authorizes a monetary award as an equitable adjustment based, in part, on which of the parties is responsible for the breakdown of the marriage. As noted above, Fam. Law § 8-101(a) permits spouses to "make a valid and enforceable . . . agreement that relates to . . . property rights[.]" This Court concludes that the lump sum monetary award constitutes a "valid and enforceable . . . agreement" regarding the parties' "property rights[]" upon the dissolution of their marriage pursuant to Fam. Law § 8-101(a). The Agreement was premised on the permissible consideration of "the circumstances that contributed to the estrangement of the parties[.]" Fam. Law § 8-205(b)(4).[16]

We find the rationale in *Laudig v. Laudig*, 425 Pa. Super. 228, 624 A.2d 651 (1993), instructive. In *Laudig*, the Superior Court of Pennsylvania upheld a provision in a postnuptial agreement under which a wife agreed to waive her right to marital property if she engaged in adultery. *Id.* at 236, 624 A.2d at 655. The court reasoned that marital agreements "allow the parties to avoid the operation of equitable distribution[,]" and "to dispose of their property rights regardless of the reasons behind" divorce. *Id.*, 624 A.2d at

---

[16] We observe that the Agreement required Petitioner to transfer $7 million up to the value of his 50% share of Column B Assets even if the parties did not divorce. Specifically, the Agreement provided that, "[i]f the parties remained married, [the] transfer shall be a permanent gift between husband and wife[.]" This Court's holding does not address the enforceability of this language. This Court's holding only addresses the enforceability of the transfer based on adultery "if the parties divorce[.]"

655. The court concluded that, "[i]f such property rights can be transferred without providing any reason to support the transfer, there should be no reason why a transfer would be invalid if it be conditioned on the occurrence of a specified type of conduct." *Id.*, 624 A.2d at 655.

Petitioner argues that *Laudig* is unpersuasive because that case did not involve a penalty provision. Although *Laudig* did not involve a penalty under liquidated damages principles, it did involve an interspousal transfer of assets based on adultery, like the lump sum provision in this case. As noted above, spouses "may make a valid and enforceable . . . agreement that relates to . . . property rights[.]" Fam. Law § 8-101(a). This freedom of contract encompasses interspousal transfers of marital assets upon divorce, regardless of whether the transfer occurs immediately, prospectively, or contingently on the occurrence of a specified event. *See id.*; *Nouri*, 245 Md. App. at 359, 226 A.3d at 818 ("Maryland law expressly permits couples to enter contracts that alter the presumptive consequences of the dissolution of a marriage." (citations omitted)).

The greater includes the lesser. As the *Laudig* court observed, "there should be no reason why a transfer would be invalid if it be conditioned on the occurrence of a specified type of conduct[,]" because spouses are permitted to transfer assets to each other for any reason. 425 Pa. Super. at 236, 624 A.2d at 655. It follows that spouses may place conditions upon the distribution of marital assets, provided those conditions comport with public policy. *See id.*, 624 A.2d at 655 (evaluating the validity of an infidelity clause based on the public policy of Pennsylvania); *Weichert Co. of Md. v. Faust*, 419 Md. 306, 325, 19 A.3d 393, 404 (2011) ("[A]bsent . . . some countervailing public policy, courts should

26

enforce the terms of unambiguous written contracts without regard to the consequences of that enforcement." (cleaned up)).

## IV.    The Public Policy of Maryland.

We hold that the public policy in Maryland currently supports spouses negotiating in good faith to condition a transfer of marital assets upon the dissolution of the marriage when a spouse commits adultery. Petitioner argues that the General Assembly has not expressly authorized penalties in marital agreements, which requires this Court to apply common law principles under Article 5(a)(1) of the Maryland Declaration of Rights. Petitioner's reliance on Article 5 is misplaced because this Court's holding is not disturbing common law precedent. As explained above, the lump sum provision is not a penalty as that term pertains to liquidated damages clauses. Instead, the lump sum provision is a conditional allocation of marital assets, which is an exercise of the parties' power to "make a valid and enforceable . . . agreement that relates to . . . property rights[.]" Fam. Law § 8-101(a).

"[T]he declaration of public policy is normally the function of the legislative branch[,]" but "[c]ourts may [also] rely on prior judicial opinions, legislative enactments, or administrative regulations as the chief sources of public policy[.]" *Yuan v. Johns Hopkins Univ.*, 452 Md. 436, 451, 157 A.3d 254, 263 (2017) (cleaned up). Given the dearth of case law regarding postnuptial agreements in Maryland, we consider decisions from other jurisdictions to ascertain the public policy that is relevant to distributions of assets based on adultery. *See Rochkind v. Stevenson*, 454 Md. 277, 288, 164 A.3d 254, 261 (2017) (considering case law from other jurisdictions when evaluating a novel issue); *Givens v.*

*State*, 449 Md. 433, 466, 144 A.3d 717, 736 (2016) (same); *Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646, 657, 97 A.3d 621, 627 (2014) (same).

Some of our sister jurisdictions have rejected provisions in marital agreements that are similar to the lump sum provision in this case on the grounds that they undermine no-fault divorce laws. In *Diosdado v. Diosdado*, the Court of Appeal of California declined to enforce a liquidated damages clause in a marital settlement agreement that imposed a $50,000 penalty for adultery because the "penalty [was] in direct contravention of the public policy underlying no-fault divorce." 118 Cal. Rptr. 2d 494, 496 (2002). In *In re Marriage of Cooper*, the Supreme Court of Iowa invalidated a postnuptial agreement that would have required a husband to pay $2,600 in temporary monthly spousal support if he committed adultery. 769 N.W.2d 582, 583–84 (Iowa 2009). The court "reject[ed] the idea of injecting the courts into the complex web of interpersonal relationships[,]" because Iowa's "no-fault divorce law [was] designed to limit acrimonious proceedings[]" and "a contrary approach would empower spouses" to contractually circumvent those laws. *Id.* at 586–87. In *Crofford v. Adachi*, the Supreme Court of Hawai'i found the reasoning in *Cooper* persuasive in a case involving a postnuptial agreement that would award a wife most of the parties' marital assets if the husband either engaged in an extramarital affair or physically harmed her. 150 Haw. 518, 519, 506 P.3d 182, 183 (2022). The court held that the agreement violated "Hawai'i's no-fault divorce policy and must be voided[,]" because it "require[d] the family court to evaluate the parties' fault[.]" *Id.* at 526, 506 P.3d at 190.

The Supreme Court of Hawai'i stated that the reasoning of cases supporting the transfer of marital assets based on adultery from jurisdictions that permit fault-based

divorce was "less persuasive in a no-fault state such as Hawai'i." *Id.* at 527, 506 P.3d at 191. The same is true for the persuasive force of *Diosdado*, *Cooper*, and *Crofford* in Maryland, because this State currently permits divorce based on fault, including adultery. Fam. Law § 7-103(a)(1).[17] Further indicia of this State's public policy lies in Fam. Law § 8-205(b)(4), which requires courts to "determine the amount and the method of payment of a monetary award[]" based on several factors, including "the circumstances that contributed to the estrangement of the parties[.]" Those "circumstances" may include adultery. *Ohm v. Ohm*, 49 Md. App. 392, 410, 431 A.2d 1371, 1381 (1981) ("[A]dultery is a factor to be considered . . . in making a monetary award."). In light of these statutes, the General Assembly has recognized that adultery is repugnant to a marriage and courts should consider adultery, to the extent it contributed to the breakdown of a marriage, as a factor when fashioning a monetary award during divorce proceedings. As the Appellate Court observed, Maryland's public policy, at a minimum, "generally frowns on adultery[.]" *Lloyd*, 255 Md. App. at 698, 284 A.3d at 829. Permitting spouses to allocate marital assets upon divorce based on adultery comports with that public policy.

Petitioner argues that it "is a dangerous idea[]" for this Court to "dabbl[e]" with adultery penalties in marital agreements. In his view, penalties will exacerbate spousal

---

[17] Fam. Law § 7-103(a)(1) currently provides that "[t]he court may decree an absolute divorce on the following grounds . . . adultery[.]" Governor Westley Moore signed a bill on May 16, 2023 that removed, among other things, "adultery" as a ground for absolute divorce and replaced it with "irreconcilable differences based on the reasons stated by the complainant for the permanent termination of the marriage[.]" 2023 Maryland Laws Ch. 645 (S.B. 36). The law shall take effect on October 1, 2023. Petitioner concedes that the former grounds for fault-based divorce, such as adultery, "will be among the reasons that a petition may cite for irreconcilable differences."

abuse and become "instruments of fear and coercion[.]" Petitioner's policy arguments would be more appropriate for the General Assembly. Furthermore, Petitioner's contentions belie the record in this case, which reflects that *he* recommended the $2 million increase to the lump sum provision and subsequently entered into the Agreement against the advice of counsel following months of negotiation. Regarding infidelity provisions that follow this Court's decision, we encourage trial courts to exercise their equitable authority to address the specter of abuse whenever it invades the negotiations or language of postnuptial agreements. *See Holtham*, 460 N.J. Super. at 325, 214 A.3d at 1235 (holding that "the family court, in exercising its broad authority, may reform a penalty provision to achieve fairness and equity.").

Based on the above principles, we conclude that Maryland's public policy currently permits spouses to transfer assets to each other based on adultery that leads to the dissolution of a marriage. The Court is not holding that spouses may impose on each other monetary penalties unrelated to marital assets or unrelated to the division of such assets during a divorce; rather, the Court is narrowly holding that spouses may allocate marital assets in the event of divorce based on adultery. We have not decided whether the above principles apply to prenuptial agreements. Our decision does not disturb precedent regarding the prohibition against "tort damages based upon adultery[,]" and penalties in traditional common law contracts. *Doe v. Doe*, 358 Md. 113, 127, 747 A.2d 617, 624 (2000) (citation omitted); *Holtham*, 460 N.J. Super. at 314, 214 A.3d at 1229 (noting that an adultery provision is unenforceable if it is included in a traditional common law contract).

**V.      The $7 Million Lump Sum Provision in the Case at Bar.**

With the above principles in mind, we hold that the $7 million lump sum provision in this case is valid and enforceable.  Petitioner argues that the provision is overly broad because it imposed the same $7 million "penalty" to conduct ranging from trivial physical contact to sexual relations.  Petitioner also claims that the $7 million lump sum is excessive because it "awarded [Respondent] more than 100% of the marital estate."  These arguments are unpersuasive.

We have limited our review to the applicability of the lump sum provision under the facts of this record.[18]  Here, the lump sum provision required Petitioner to transfer $7 million up to the value of his 50% share of Column B Assets if the parties divorced after he engaged in adultery.  Fam. Law § 7-103(a)(1) permits spouses to file for divorce on the grounds of adultery, which supports provisions that distribute assets based on that conduct. The lump sum provision did not restrict Petitioner's ability to foster his platonic relationships.  Respondent's mere suspicions were insufficient to trigger the provision because she was required to establish "by a preponderance of the evidence" that Petitioner had engaged in adultery.  Petitioner alone controlled whether the provision would trigger.

---

[18] The Court has not addressed whether the lump sum provision would be enforceable if Petitioner had engaged in the other specified conduct.  The lump sum provision triggered if Petitioner engaged in "adultery, buggery, or sodomy[,] as well as the following "[i]nappropriate and/or [i]mmoral [c]onduct":

> inappropriate emails; sexting; sending pornographic pictures of himself to the other person; receiving pornographic pictures of the other person; romantically kissing, hugging, fondling, or embracing another person; keeping secret email, cell phone or credit card accounts; or engaging in sexual acts with another person even if it does not lead to intercourse.

31

The lump sum provision did not require the parties to remain married. Indeed, nothing prevented Petitioner from divorcing Respondent, thereby rendering the provision inoperative, and subsequently pursuing a romantic or sexual relationship with another person. In essence, the lump sum provision required Petitioner to remain faithful to Respondent. We reject the contention that remaining faithful to a spouse is too onerous of an obligation.

There is no dispute that Petitioner could have transferred $7 million to Respondent had the transfer not been conditioned upon his infidelity. As the *Laudig* court observed, this broad power to contract allows parties to place conditions upon those transfers based "on the occurrence of a specified type of conduct[,]" such as adultery. 425 Pa. Super. at 236, 624 A.2d at 655. Like the spouses in *Dougan*, Petitioner and Respondent entered into the Agreement after consulting attorneys, participating in lengthy negotiations, and thoroughly reviewing the terms. 114 Conn. App at 387–88, 970 A.2d at 138. As with the husband in *Holtham*, Petitioner's access to counsel establishes that "he understood the nature of the [adultery] provision and was prepared to abide by it[.]" 460 N.J. Super. at 325, 214 A.3d at 1235.[19] We note that Petitioner proposed the $2 million increase to the

---

[19] Courts evaluating the "negotiations preceding the provision's adoption[]" may consider "the parties' relative bargaining power and sophistication, their understanding of the provision, and whether they were assisted by independent counsel." *Holtham*, 460 N.J. Super. at 324–25, 214 A.3d at 1235; *see also Kreter v. HealthSTAR Comm'ns, Inc.*, 172 Md. App. 243, 263, 914 A.2d 168, 180 (2007) ("Maryland courts' recalcitrance in voiding contracts on public policy grounds is particularly acute when the involved parties are sophisticated, knowledgeable about the matter at hand, and of equal bargaining power[.]"). The non-exclusive hallmarks of a sophisticated party include: (1) "[c]orporate entity or . . . an individual [corporate] investor[;]" (2) "[g]overnment or quasi-public entity;" (3) "[e]ntity . . . represented by counsel – or that has access to lawyers and accountants;" (4)

lump sum provision and thereafter entered into the Agreement against the advice of counsel. It is immaterial that the provision applied exclusively to Petitioner because he could have negotiated for it to apply to Respondent as well. Additionally, that limitation was logical because Petitioner was the only party who had previously been unfaithful. Petitioner's promise to remain faithful was part of his consideration for Respondent agreeing to remain married to him.

Regarding whether the sum was too severe, we recognize, as Petitioner states, that monetary awards under Fam. Law § 8-205(a)(1) "cannot exceed the value of the marital [estate]."[20] *Odunukwe v. Odunukwe*, 98 Md. App. 273, 282, 633 A.2d 418, 422 (1993). We need not address whether this limitation applies to interspousal transfers in postnuptial agreements because the Agreement already provides a limitation to the $7 million transfer. Here, the "[t]he transfer [of $7 million would] be made from [Petitioner's] 50% share of the Column B Assets." By identifying a source, *i.e.*, marital property, for the $7 million,

---

"[e]ducated – especially doctors and lawyers;" (5) [e]xperienced in business or specific field[;]" (6) "[w]ealthy or significant market share in a given industry;" or (7) "[t]he deal is complicated, long-term or expensive." Meredith R. Miller, *Contract Law, Party Sophistication and the New Formalism*, 75 Mo. L. Rev. 493, 522–24 (2010) (cleaned up). Party sophistication is based on a totality of the circumstances regarding "the relative experience and resources of the parties to the contract in the context of the particular type of transaction." *Id.* at 533.

[20] Under Fam. Law § 8-205(a)(1), parties may request a monetary award, which requires the court to: (1) "determine which property is 'marital property' subject to allocation[;]" (2) "determine the value of the marital property[;]" and (3) consider several factors before fashioning an award. *Alston v. Alston*, 331 Md. 496, 498–500, 629 A.2d 70, 71–72 (1993) (citations omitted); Fam. Law §§ 8-203 (providing for the determination of marital property), 8-204 (providing for the valuation of marital property), 8-205 (providing various factors for the court to consider before granting a monetary award).

the Agreement limits the transfer to the cumulative value of those assets. Indeed, Petitioner cannot transfer $7 million from his 50% share if its value falls below $7 million. For example, if the value of Column B Assets was $28 million when the lump sum provision triggered, then Petitioner's 50% share would be $14 million. In that case, he could fully satisfy the $7 million transfer. However, if the value of Column B Assets fell below $14 million, then Petitioner's 50% share would be less than $7 million. In this second scenario, Petitioner would be unable to transfer the full $7 million.

Since the lump sum provision only addressed Petitioner's 50% share and no other asset, Respondent would be unable to pursue Petitioner's non-marital assets to satisfy the difference. As a result, Petitioner only risked the value of his 50% share of Column B Assets or $7 million, whichever was less. By limiting its scope to marital assets, the lump sum provision "eliminate[d] a source of emotional turmoil—[specifically], financial uncertainty—and [allowed the spouses to] focus instead on resolving other aspects of the marriage that may be problematic." *Bedrick*, 300 Conn. at 698, 17 A.3d at 24. Absent the trigger based on adultery, these provisions would be unremarkable because the lump sum provision simply recategorized certain non-marital property as marital property and "alter[ed] the presumptive consequences of the dissolution of a marriage." *Nouri*, 245 Md. App. at 359, 226 A.3d at 818 (citations omitted). Therefore, we hold that the lump sum provision was valid and enforceable. We further hold that Respondent is entitled to no more than Petitioner's "50% share of the Column B Assets."

**CONCLUSION**

The lump sum provision cannot be evaluated under a liquidated damages framework because that framework is inapplicable to postnuptial agreements. Spouses may enter into valid and enforceable agreements, under which they may freely transfer assets to each other and place conditions that comport with public policy on those transfers. We hold that the public policy in Maryland supports interspousal distributions of marital assets based on adultery in postnuptial agreements because this State: (1) currently permits divorce based on fault, including adultery; and (2) permits courts to consider adultery, where it contributes to the estrangement of the parties, as a factor in making a monetary award under Fam. Law § 8-205(b)(4). In the case at bar, the lump sum provision was applied based on Petitioner's adultery, did not restrict Petitioner from building his platonic relationships, and did not require him to remain married to Respondent. We agree with the circuit court's observation that "the decision to agree to the $7 million [transfer] may have been improvident," but that alone does not warrant voiding a provision that both parties had negotiated over several months with the assistance of counsel. Pursuant to the plain language of the lump sum provision, we conclude that Respondent cannot collect more than the value of Petitioner's "50% share of the Column B Assets." For the foregoing reasons, we affirm the decision of the Appellate Court of Maryland.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

35