*Chukwuemeka Mezu v. Kristen Mezu*, No. 361, September Term, 2025. Opinion by Graeff, J.

**CITATIONS TO FICTITIOUS CASES GENERATED BY ARTIFICIAL INTELLIGENCE**

The use of artificial intelligence ("AI") may be a valuable tool in legal practice, but it must be used responsibly. Courts across the country have recently been presented with briefs and pleadings containing fraudulent legal citations, which result from AI "hallucinations." If, as in this case, an attorney fails to read the AI generated citations submitted in a brief, it can result, as it did here, in a brief containing citations to multiple fictitious cases and to cases that do not support the proposition for which they are cited. Based on the nature and severity of the conduct here, this Court shall refer the attorney to the Attorney Grievance Commission.

Circuit Court for Harford County
Case No. C-12-FM-24-001689

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 361

September Term, 2025

_____

CHUKWUEMEKA MEZU

v.

KRISTEN MEZU

_____

Graeff,
Arthur,
Woodward, Patrick L.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Graeff, J.

_____

Filed: October 29, 2025

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

This appeal arises from a Motion to Invalidate portions of a Marital Settlement Agreement ("the MSA") entered into by Kristen Mezu ("Mother") and Chukwuemeka Mezu ("Father") after Mother filed a Complaint for Absolute Divorce. On March 19, 2025, the Circuit Court for Harford County issued an order modifying the MSA, in part, and otherwise incorporating the MSA into the court's order.

On appeal, Father presents eight questions for this Court's review,[1] which we have

---

[1] Appellant raised the following questions:

1. Whether the Circuit Court committed a legal error when it departed from Maryland Law and established precedent that places the best interests of the child as a paramount factor in custody matters.

2. Whether the Circuit Court committed legal error in upholding an MSA that was procedurally and substantively unconscionable.

3. Whether the Circuit Court committed legal error by denying Mr. Mezu his fundamental right to parent.

4. Whether the Circuit Court committed legal error by issuing the March 19, 2025 Order Without Waiting for Mr. Mezu to Respond.

5. Whether the Circuit Court committed legal error when it deviated from its own order by reducing the entire MSA into an order instead of only the personal property Order that it had ordered from both parties.

6. Whether the Circuit Court Abused its Discretion by Not Granting Mr. Mezu hearings on his Motions/Requests.

7. Whether bias in the Circuit Court Affected the Course of Proceedings in this case.

8. Whether the Circuit Court erred in upholding an MSA that had a notary date that was dated a year prior to the date the agreement was signed.

consolidated and rephrased, as follows:

1. Did the circuit court err in issuing the March 19, 2025, Order?

2. Did the circuit court err by not granting Father a hearing on his post hearing motions?

3. Did the circuit court act with judicial bias?

For the reasons set forth below, we shall affirm the judgment of the circuit court. We also address problems regarding Mother's brief in this case, specifically the citation to fake cases generated by artificial intelligence ("AI").

**I.**

**SUBMISSION OF FAKE OR INACCURATE AI GENERATED CITATIONS**

The issues raised by Father typically would not result in a reported opinion. We report this case, however, to address a problem that is recurring in courts around the country, i.e., the use of AI to draft briefs or other pleadings, resulting in incorrect, inaccurate, or fictitious case citations. Mother's brief in this case is replete with citation irregularities. These irregularities include citations to multiple fictitious cases, as well as misquoted passages and citations to cases that do not support the proposition for which they are cited. Before addressing the merits of the issues raised, we address this problem. We do so as a warning to others and to determine the court's appropriate response in this case.

2

## A.

## Factual Background

After reviewing the briefs in preparation for oral argument, and finding the citation irregularities mentioned, this Court issued an Order to Mother's counsel to Show Cause ("OSC") why he should not be sanctioned and/or referred to the Attorney Grievance Commission. The OSC ordered Mother's counsel to provide the Court with a written submission in the form of a sworn declaration and provide a detailed explanation as to how Mother's brief was generated, how counsel located the fictitious cases, and why counsel cited cases that did not stand for the proposition cited.

In his response to the OSC, counsel stated that he prepared the brief in collaboration with a law clerk who had worked in his office since 2021. Counsel stated that he "does not use Lexis and/or Westlaw because he does very little appellate work." He indicated that he relied primarily on treatises for research and then retrieved the cited cases from the internet. Mother's counsel stated that he had "never used artificial intelligence for any professional purpose." After reviewing the law clerk's initial draft, counsel "inquired about her research process." The law clerk advised that she had located cases on the internet, printed case notes, and verified the citations. Mother's counsel stated that he "was not involved directly in the research of the offending citations," and he believed that he complied with the Maryland Rules of Professional Conduct based on his law clerk's "efforts at vetting the referenced cases." He acknowledged, however, that "his oversight was insufficient to ensure that all citations were verifiable Maryland authority."

The law clerk submitted an affidavit stating that she graduated from law school in 2020 and had been a law clerk for Mother's counsel since September 2021. She assisted counsel with the drafting of, and research for, the brief in this case. The law clerk utilized AI in her research, explaining that she began by using ChatGPT to search for relevant cases. She received a generated list of cases, which she acknowledged included cases that were inaccurately cited and did not exist. She then "searched for the case opinions via a basic Google search in order to extract proper citations, on-point verbiage, and to identify further cases cited within the proffered case."

After reviewing those results, the law clerk initiated a free trial of a "for-pay" website called "VLex," where she "was able to find the case opinions from the list provided by ChatGPT." (Footnote omitted). She stated that her "examination of these case opinions did not raise any 'red flags.'"[2] The law clerk primarily used ChatGPT and VLex, but she also visited Court Listener, CaseMine, and Justia. She stated that she "was not aware that these sites were controlled by AI, or that the search results produced by these sites were the product of AI." The law clerk then finalized her draft and forwarded it to counsel.

Counsel then made changes to the draft and asked the clerk to review the latest version to ensure that the cases were accurately cited. The law clerk relied on ChatGPT to "review the citations for accuracy." The affidavit states that counsel asked her multiple

---

[2] Although the law clerk stated in her affidavit, and Mother's counsel suggested at oral argument, that the internet searches produced case opinions, no full case opinions for the fake cases cited in the brief were included with the materials submitted in response to the OSC. At the most, there was a summary of a case, with a notation at the bottom that "AI responses may include mistakes. For legal advice, consult a professional."

4

times whether she checked the case citations, and the law clerk assured counsel that she had complied with his requests.

The law clerk stated that, until receipt of the OSC, she believed that AI tools "essentially operate as a data or information aggregator that allowed for more in-depth and extensive research results." She only learned the risks of hallucinated AI results after counsel received the OSC. The law clerk stated that the topic of AI had never been raised either by her or Mother's counsel. She never advised counsel that she had been using AI, and counsel never advised her to either use or avoid the use of AI.

At oral argument, counsel for Mother acknowledged, as required, that because he was the only lawyer involved in the case, and the one who signed and submitted the brief to this Court, he was responsible for the improper case citations.[3] After receiving the OSC, both counsel and the clerk completed continuing legal education courses on the ethical use of AI, and counsel implemented protocols for research and citation verification. Counsel for Mother requested in the response to the OSC that, in light of his acceptance of responsibility and remediation, this Court discharge the OSC, grant him leave to file a corrected brief, and decline referral to the Attorney Grievance Commission.

---

[3] Under Maryland Rule 1-311(b), the signature of an attorney on a brief constitutes a certification that the attorney has read the brief, and "to the best of the attorney's knowledge, information, and belief there is good ground to support it."

**B.**

**Analysis**

Recently, courts across the country have been presented with briefs containing "fraudulent legal citations." *Noland v. Land of the Free, L.P.*, 336 Cal. Rptr. 3d 897, 911 (Cal. Ct. App. 2025). This case, however, appears to be the first where the Maryland appellate courts have addressed the problems that occur when lawyers use AI, without the diligence required, in drafting briefs. The failure to use AI responsibly in legal research raises ethical issues and can result in sanctions when used improperly. It is unquestionably improper for an attorney to submit a brief with fake cases generated by AI.

The use of AI in a legal practice is not inherently problematic, and it may be a valuable tool. As Chief Justice John Roberts has noted, however, the use of AI requires "caution and humility." John G. Roberts, Jr., *2023 Year-End Report on the Federal Judiciary*, SUPREME COURT OF THE UNITED STATES, 5 (Dec. 31, 2023), https://perma.cc/YF76-RWVH (last visited Oct. 15, 2025).

Fake or nonexistent legal citations typically are the result of AI "hallucinations." *Noland*, 336 Cal. Rptr. 3d at 911. As the court in *Noland* recently explained, tests have shown that some models hallucinate "30-50% of the time," noting that "many AI models 'are designed to maximize the chance of giving an answer, meaning the bot will be more likely to give an incorrect response than admit it doesn't know something.'" *Id.* (quoting Conor Murray, *Why AI 'Hallucinations' Are Worse Than Ever*, FORBES (May 6, 2025), https://perma.cc/9RC2-CCEJ (last visited Oct. 15, 2025)). AI hallucinations may occur more often when there is no case in support of a request, such as "when a lawyer asks a

6

generative AI tool to supply a citation for an unsupported principle of law." *Id.* Hallucinated cases are "inaccurate depictions of information from AI models that suffer from incomplete, biased, or otherwise flawed training data." *Id.* (quoting *Malone-Bey v. Lauderdale Cnty. Sch. Bd.*, No. 3:25-cv-380-KHJ-MTP, 2025 WL 2098352, at \*4 (S.D. Miss., July 25, 2025)).

The citation of fake cases in a brief or other pleading filed with a court implicates multiple Maryland Rules. As indicated, Rule 1-311(b) provides: "The signature of an attorney on a pleading or paper constitutes a certification that the attorney has read the pleading or paper; that to the best of the attorney's knowledge, information, and belief there is good ground to support it; and that it is not interposed for improper purpose or delay." Implicit in the requirement that an attorney certify that there is good ground to support the contentions raised is that the attorney has read the primary cases on which the attorney relies for the argument submitted. Indeed, as one court said in interpreting Federal Rule of Civil Procedure 11(b)(2),[4] the federal rule analogous to Rule 1-311, "[a]t the very least, the duties imposed by Rule 11 require that attorneys read, *and thereby confirm the existence and validity of*, the legal authorities on which they rely." *Benjamin v. Costco Wholesale*

---

[4] Fed. R. Civ. P. 11(b) provides: "By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."

*Corp.*, 779 F. Supp. 3d 341, 347 (E.D.N.Y. 2025) (quoting *Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024)).

Here, Mother's counsel admitted that he did not read the cases cited. Instead, he relied on his law clerk, a non-lawyer, who also clearly did not read the cases, which were fictitious.

Counsel's conduct here implicates several of the Maryland Attorney's Rules of Professional Conduct. Rule 19-303.1 mandates that attorneys bring or defend only meritorious issues. It provides that an attorney "shall not bring or defend a proceeding or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous." A "citation to a fake opinion does not provide a non-frivolous ground for" bringing or defending a proceeding. *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 461 (S.D.N.Y. 2023).

In addition, Rule 19-301.1 provides: "An attorney shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." A comment to this rule provides that "[c]ompetent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners." Rule 19-301.1 cmt. [5]. "It also includes adequate preparation." *Id.*

Here, counsel admitted to not having a Lexis or Westlaw subscription because he "does very little appellate work." Instead of adequately preparing himself regarding the law, counsel left this work, in part, to his law clerk, a non-lawyer, and then failed to verify

8

the accuracy of the research. He stated that he "was not involved directly in the research of the offending citations," yet he did not confirm how the cases that were cited were obtained, without Lexis or Westlaw, and he asked only if the law clerk had verified the citations to the cases, which he had not read. In our view, this does not satisfy the requirement of competent representation. A competent attorney reads the legal authority cited in court pleadings to make sure that they stand for the proposition for which they are cited.

Rule 19-305.3(b) provides that, "an attorney having direct supervisory authority over [a] non-attorney shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the attorney." As the Supreme Court of Maryland has explained, an attorney cannot escape responsibility for problems caused by an employee. *Att'y Grievance Comm'n v. Glenn*, 341 Md. 448, 479 (1996). An attorney must ascertain that all employees perform their responsibility in a competent manner. *Id.* Counsel's supervision here did not meet this standard.[5]

Mother's counsel has admitted his responsibility for submitting a brief with fictitious, and otherwise inaccurate, cases because he was responsible for supervising the law clerk's work. He has taken steps to ensure that this situation does not occur again, and he clearly was not happy to be in Court to address the OSC. Nevertheless, it would be a stretch to say that he was remorseful for his failures and the extra work that he caused in

---

[5] We note that Rule 19-303.3 (Candor toward the tribunal) provides: "An attorney shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal." Counsel has represented that he did not know that several of the cited cases were fictitious or that others did not stand for the proposition cited. We have no basis to discredit that statement.

this case. Indeed, when questioned at oral argument about the concern that he clearly did not read the cases before submitting his brief (because the fictitious cases did not exist), counsel did not appear to share that concern, stating that he typically did not read cases he cites, but instead, he relies on summaries found in treatises or on the internet. As the *Noland* court recently stated: "[s]imply stated, no brief, pleading, motion, or any other paper filed in any court should contain *any* citations—whether provided by generative AI or any other source—that the attorney responsible for submitting the pleading has not personally read and verified." *Noland*, 336 Cal. Rptr. 3d at 901. Counsel's conduct in this case falls far short of his professional responsibilities.

Submitting fake cases to the court in a legal brief or other pleading can result in multiple harms. An attorney's failure to comply with the attorney's ethical obligations undermines the integrity of the judicial system, and it can hurt the client's case. Here, in addition to detracting from counsel's credibility, addressing this issue required counsel to take time at oral argument that otherwise could have been devoted to the merits of Mother's case. Counsel's conduct here also required this Court to take time to try to find the fake cases cited in Mother's brief, and then research how other courts have dealt with situations involving similar attorney misconduct, diverting judicial resources from other pressing work.[6]

---

[6] Citing fake cases also may cause the opposing party to waste time and money addressing this issue. This does not appear to be the case here. Father did not address the issue in his reply brief and appears to have discovered it only after this Court issued the OSC.

10

## C.

### The Court's Response

In determining how to respond to counsel's conduct in this case, we looked to how other courts have responded to similar situations. "Courts across the country have issued sanctions against attorneys . . . for submitting fictitious case citations, fictitious quotations, and related misrepresentations to the court." *United States v. Hayes*, 763 F. Supp. 3d 1054, 1071 (E.D. Cal. 2025). Courts have issued monetary sanctions, as well as referring the attorney for potential disciplinary proceedings, and ordering counsel to serve a copy of the court's decision on the client. *See Benjamin*, 779 F. Supp. 3d at 351 (sanction of $1,000 payable to the clerk of the court and order to serve a copy of the court's sanction order on client); *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 498 (D. Wyo. 2025) (revoke pro hac vice status and sanction of $3,000 payable to the Registry of the Court); *Gauthier v. Goodyear Tire & Rubber Co.*, No. 1:23-CV-281, 2024 WL 4882651, at *3 (E.D. Tex. Nov. 25, 2024) (sanction of $2,000 as well as order to attend a continuing legal education course on the topic of generative AI and provide a copy of the sanction order to client); *Noland*, 336 Cal. Rptr. 3d at 915 (sanction of $10,000 payable to the clerk of the court and order to the clerk of the court to serve a copy of the opinion on the state bar association and for attorney to serve a copy on the client); *Keaau Dev. P'ship LLC v. Lawrence*, 571 P.3d 958, 960 (Haw. Ct. App. 2025) (monetary sanction of $100 to the clerk of the Supreme Court); *Garner v. Kadince, Inc.*, 571 P.3d 812, 816 (Utah Ct. App. 2025) (order to refund all fees charged to counsel's client associated with the pleading, pay the opposing party's

11

attorney's fees associated with responding to the pleading, and pay a $1,000 donation to "and Justice for all").

As these cases reflect, many courts have responded to the citation of AI-generated fictitious cases with monetary sanctions, payable to either the opposing litigant, the clerk of the court, or a legal charity. In this case, however, there has been no request for monetary sanctions, and neither party addressed the issue of monetary sanctions after the court issued the OSC. Given the lack of a request, and the lack of citation to any authority authorizing this Court to award a monetary sanction without such a request, we will not impose any monetary sanction.[7]

---

[7] We note that other states have statutes and rules specifically authorizing an appellate court to issue sanctions without a motion from a party. For example, in *Noland v. Land of the Free*, 336 Cal. Rptr. 3d 897, 909-10 (Cal. Ct. App. 2025), the court imposed monetary sanctions based on statutes and a rule allowing an appellate court to impose monetary sanctions against an attorney. *See* Cal. Civ. Proc. Code § 907 (West 2025) ("When it appears to the reviewing court that the appeal was frivolous or taken solely for delay, it may add to the costs on appeal such damages as may be just."); Cal. Civ. Proc. Code § 128.7 (West 2025) (an attorney may be sanctioned for submitting a pleading for which the attorney does not have a belief "formed after an inquiry reasonable under the circumstances" that the "legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law."); Cal. Rules of Court, rule 8.276 (permits the court to sanction a party who unreasonable violates the rules of court). *Accord Shahid v. Esaam*, 918 S.E.2d 198, 202, 202 n.17 (Ga. Ct. App. 2025) (imposing monetary sanction under Court of Appeals Rule 7(e)(2), which permits the appellate court, with or without motion, to impose a penalty in a civil case where an appeal is determined to be frivolous, and noting as well the court's inherent power, mentioned in Rule 7(a), to maintain control over proceedings conducted before it); *Garner v. Kadince, Inc.*, 571 P.3d 812, 816 (Utah Ct. App. 2025) (monetary sanction of $1,000 under Utah Rule 40(c), which provides that the appellate court may sanction attorneys for failure to comply with court rules). The General Assembly and the Rules Committee may want to address whether a more specific statute or rule permitting this Court to award sanctions in cases such as the present case is warranted.

12

We also will not, as counsel requests, allow Mother to file a supplemental brief. The case has been fully briefed and argued, and allowing Mother to correct counsel's mistakes at this point would not be fair to Father.

Because counsel engaged in unprofessional conduct, however, we have an ethical duty to respond. Rule 18-102.15(a) provides that, with respect to the unprofessional conduct of an attorney, "[a] judge shall take or initiate appropriate corrective measures." As the comment to this rule notes, appropriate corrective measures include "a wide range of options," including direct communication with the attorney or "other direct action if available." Rule 18-102.15 cmt [1]. In the situation where "other corrective measures are not appropriate or, if attempted, were not successful, a judge shall inform the Attorney Grievance Commission of facts known to the judge that raise a substantial question as to an attorney's honesty, trustworthiness, or fitness as an attorney in other respects." Rule 18-102.15(c).

In determining whether to refer counsel to the Attorney Grievance Commission, we have considered the nature and severity of the conduct in this case. The brief here did not contain an isolated instance of a citation mistake. Rather, it cited multiple cases that did not exist, as well as others that did not support the proposition for which they were cited. When asked at oral argument about the concern when a lawyer obviously has not read the cases cited to the court, counsel indicated that this was not a unique circumstance, stating that he typically did not read the cases he cited in pleadings submitted to the court. Based on all the circumstances, we shall refer this case to the Attorney Grievance Commission.

## II.

## ISSUES ON APPEAL

## A.

## FACTUAL AND PROCEDURAL BACKGROUND

## 1.

## Events Leading to Court Hearing

Mother and Father were married on September 17, 2011, in Baltimore County, Maryland. During the marriage, Mother and Father had three children, A.M., born in 2013; E.M., born in 2015; and T.M. born in 2019 ["the children"].[8]

On October 17, 2024, Mother filed a Complaint for Absolute Divorce, alleging that the "discord between the parties has been such that [Mother had] no choice but to terminate the marital relationship." She asserted that the "parties have reached a juncture where they are not able to resolve their differences so as to resume the marital relationship." Mother requested that she be granted primary physical custody of the parties' children, and any contact that Father had with the children be supervised and contingent upon Father's participation in mental health counseling.

Mother also requested that Father be ordered to pay child support and alimony. Mother requested possession of the personal property located in the family home, as well as possession of the home itself. She requested the division and sale of the real property, with the court to distribute the proceeds equitably. Finally, Mother requested that the court

---

[8] In the interest of privacy, we refer to the minor children by the initials A.M., E.M., and T.M.

14

"determine the ownership of all personal property of the parties, or either of them, and order a partition or sale in lieu of partition of such jointly owned personal property and a division of the proceeds."

On October 29, 2024, Mother's counsel drafted the MSA and sent a copy to Father. Counsel advised Father that he represented Mother, not Father, and Father had "the absolute right to independent counsel of [his] own selection." Father stated that, on November 15, 2024, without consulting an attorney, he signed the MSA.

The MSA stated that the parties desired to make a "full and complete settlement of all issues arising from the marriage, including custody, visitation, child support, alimony, property disposition, and monetary awards, without waiving any ground for divorce." The parties agreed that, after the sale of the marital home, they would "commence living separate and apart, without interruption, continuously and with the intent of ending their marriage."

Item 3 of the MSA sets forth how Mother and Father will divide their property. It provides as follows:

**Item 3**. **PROPERTY- GENERALLY.**

A. **Wife's Property**: Husband hereby conveys to the Wife all of his right, title and interest in the following:

1. All financial institution accounts in the Wife's name alone, including, but not limited to, checking accounts, savings accounts, 401(k)s, 403(b)s, IRAs, or any other type of retirement interests, Certificates of Deposit, Stocks and/or Bonds (if any);

2. Lexus 570, titled in the Wife's name alone, no lien thereon;

15

3. All contents, including but not limited to, the furnishings, furniture and fixtures of the Marital Home.

B. **Husband's Property**. Wife hereby conveys to the Husband all of her right, title and interest in the following:

1. All financial institution accounts in the Husband's name alone, including, but not limited to, checking accounts, savings accounts, 401(k)s, 403(b)s, IRAs, or any other type of retirement interests, Certificates of Deposit, Stocks and/or Bonds (if any);

2. Mercedes S600, titled in the name of Kibram, LLC alone, no lien thereon;

3. All of his personal computers, personal computer accoutrements and personal computer software.

C. **Husband's Business Interests**. Wife hereby waives all right, title, and/or interest in or to any business interests owned by, controlled by, and/or managed by Husband, including, but not limited to Kibram, LLC and Husband hereby indemnifies and holds Wife harmless of any and all liability related to any such business interests.

In addition to dividing property, the parties agreed to divide certain debts to "immediately list the Marital Home for sale" and divide the net proceeds "evenly between the parties," and to each waive any claim for alimony from the other, as well as any claim for a monetary award.

Item 5 of the MSA deals with child custody, providing that Mother have sole physical and legal custody of the children. The parties agreed, in Item 6, that "neither shall owe any duty of child support unto the other, and specifically, [Father] shall have no duty to pay child support unto [Mother]."

16

On November 20, 2024, Mother filed an Amended Complaint for Absolute Divorce. The Amended Complaint noted that Mother and Father had executed the MSA, "which resolves all issues attendant to this pending action, including, but not limited to the issues of child custody, child support, alimony, property, monetary award, and attorney's fees."

On November 22, 2024, Father filed a *pro se* Motion to Invalidate Items 3 and 5 of the MSA, stating that he "unknowingly, under duress, extreme stress signed away his parental rights and his right to his personal property."

With respect to Item 5, Father argued that "[i]t is not in the best interest of the parties' minor child[ren] for them to be separated and alienated forever from their father who has lived and provided and cared for them since birth." He argued that he was "a fit and proper person to have liberal visitation with his minor children," and it "was unconscionable for his minor children to be separated from him and for him not to be involved in his children's lives."

With respect to Item 3 of the MSA, Father stated that he disavowed that provision because it did not take into account the personal property items that he owned and still had in the home, and it excluded "his clothing, shoes, furnishings, personal care items, personal records, and photographs." Father asked the court to invalidate Items 3 and 5 of the MSA because "they were signed under duress and are not in the best interest of the parties' minor children."

## 2.

## Motion to Invalidate Hearing

On February 19, 2025, the circuit court held a hearing on Father's Motion to Invalidate Items 3 and 5 of the MSA. Father, now represented by counsel, noted, and the court agreed, that not many agreements failed to include a visitation schedule for the children. Counsel advised that he would be "de-emphasizing" the defense of duress, which Father made in his *pro se* Motion to Invalidate. Rather, "the real issue is unconscionability. And the substantive unconscionability relates to the provisions associated with the custody."

Mother's counsel noted that the custody provisions could be modified at a later time, at which point child support would then be contested. With respect to the rest of the agreement, however, he argued that it was valid and enforceable agreement.

Father then testified. He stated that, after Mother filed the October 17 Complaint for Absolute Divorce, she gave him a lot of ultimatums and said that if he did not sign the agreement, there was "no hope of the family ever getting back together." He believed that, if he signed the MSA, it would help him "reestablish a positive relationship with [Mother]."

Father testified that, when he signed the MSA on November 15, 2024, his relationship with his kids was excellent. He signed the MSA, which did not provide a child access schedule, because he was trying to please his wife, and the MSA was what she wanted. He believed that if he signed the agreement, she would drop the divorce proceedings.

18

On cross-examination, Mother's attorney asked if there was a lot of negotiation between Mother and Father regarding the family's future. Father, who had a master's degree, acknowledged that there were a lot of discussions during that period. Mother initially proposed that Father refinance the home into Mother's parents' name because the mortgage had not been paid in a long time. She proposed that Father give Mother equity in the house and primary custody, and in return Father would receive a waiver of alimony and child support. Father said no and then wrote a note proposing that they agree to "no child support, no spousal support" and to "[s]ell the house. 50/50 split." The note then stated: "you can't ask for any support in the future, [and] you can keep the kids." Father stated that he wrote this in a moment of distress.

With respect to Item 3 of the MSA, Father testified it was unconscionable because he could not even take his clothes. Father agreed that the MSA provided that Mother was entitled to all contents of the marital home, with the exception of the computer equipment. Nevertheless, he acknowledged that he had come to the family home with a U-Haul and began moving expensive items from the home, stating that they were his personal belongings. The items he took included the children's "four-wheelers," which he purchased and maintained. He stated that he asked Mother to get his clothing, but she did not give him an answer and his clothes were still at the house.

On redirect examination, Father explained what he meant when he wrote the note that Mother could keep the kids. He testified that he meant that she could have physical custody so the kids would not have disruptions at school and their activities.

In closing argument, counsel for Father argued that Items 3 and 5 of the MSA were unconscionable. Counsel stated that they were asking "that he get his stuff and that he have time with the kids."

Mother's counsel argued that the agreement was not unconscionable. Rather, this was a case of "buyer's remorse." Counsel stated, however, that if the court wanted to modify the agreement so that Father could get his clothes and photographs, that was fine. He noted that Mother wanted "the stuff in the house and the kids," and in return, she gave up child support, alimony, and any interest in Father's business.

The court then issued its ruling as follows:

> So as far as item 3, letter A, number 3, I'm going to strike the language that's there and modify it so that [Mother] will keep the contents, including but not limited to furnishings, furniture, and fixtures at the marital home, except for [Father's] personal property, including his clothing. That's going to be added in there. I don't know whether I have authority to do that, but I just did it so that it's very clear what he is able to take from the property.[9]

> Should he take the children's little all-around tractor things or whatever they were? Absolutely not. He should not be taking those things off the property.

Mother's attorney then asked the court to define "personal property." The court stated that Father could not take the washer, the dryer, the refrigerator, or mirrors hanging on the wall. He could take his own personal property from the residence when he moves out. Father could take a personal recliner if he had one, but he was not to take the children's bedroom furniture, the living room or kitchen furniture, the dining room furniture, the

---

[9] Mother has not challenged on appeal the court's action in this regard.

marital bed, or anything else from the bedroom. The court reiterated that Father could take

his personal stuff.

The court continued:

> [W]hat I suggest is, before I sign an order, that you all have a
> meeting and you make a list of specifically and exactly what it
> is that [Father is] able to take from the property so we don't
> have any more litigation and any more disturbance about . . .
> what he's allowed to take.

The court stated that it wanted a list by agreement before it signed an order. The court

continued:

> And God help me if there's stuff that is not. Because when I
> did divorce cases as a judge full-time if [the parties] couldn't
> agree, it got put out on the lawn and sold . . . . But this
> agreement doesn't contemplate that because it says all
> contents, so I don't know what I'll do when they can't agree.

With respect to Item 5, the court found that the child custody provision, which gave

sole physical and legal custody of the Minor Children to Mother, "certainly wouldn't be

my preference for an agreement." It stated, however, that it did not find the agreement

unconscionable. The court explained:

> When the parties are engaged in their divorce litigation, these
> issues should be raised as what is in the best interests of the child. And
> I will state for the record that when [Father] moves from the house . .
> . that is a material change of circumstance . . . . So, I'm not going to
> strike that paragraph, but I am going to indicate that the day that
> [Father] moves from the house, that there is a material change of
> circumstance that needs to be considered by the parties first to see if
> they can make an agreement, and if they cannot, it will be . . . imposed
> by the [c]ourt.[10]

---

[10] Earlier in the proceedings, the court stated that the provisions of the MSA were
not unconscionable because Father could file a petition for whatever access he wanted once
the parties were not living together.

21

Mother's attorney expressed confidence that the attorneys could resolve the issues of property. He offered to draft a proposed order and submit it to the court after the parties created the list of Father's personal property.

**3.**

**Events Following the February 19 Hearing**

On March 14, 2025, Father's attorney sent Mother's attorney an email attaching a "comprehensive list of personal property" that was still located in the home and was alleged to be Father's property. The email stated that "[m]ost of the stuff [on the list] is either pre-marital or personal." Attached to the email was a four page list, which included: (1) recreation and exercise equipment, including an elliptical, a basketball hoop, weight lifting equipment, and a grill; (2) personal electronics, including several gaming consoles and games, a television, two cell phones, a camera, and a speaker system; (3) business electronics, including computers, monitors, tablets, and a printer; (4) office furniture; (5) personal furniture, including living room, dining room and bedroom sets; (6) personal tools and equipment, including a subcompact farm tractor, workbench, pressure washer, and power tools; and (7) personal items, including clothing, personal hygiene and grooming items, personal jewelry, medical and health related items, personal documents, and hobby and recreational equipment, including a television, golfclubs, books, and art.

Mother's counsel responded: "It is rejected. [The trial judge] was clear what she meant by personal property." Counsel stated that, because Father would not follow the court's instructions, he would submit a proposed order to the court and copy Father.

That same day, Mother sent the court a proposed order, with a letter noting that "the parties cannot agree on the form of the proposed order." Counsel stated that, although the court had modified the MSA to allow Father to retain his "personal property," Father "presented a list of property which was substantially comprised of items which no objective individual could or would define as being 'personal property.'" Counsel stated that he was attaching a proposed order that he believed fully reflected the court's ruling from the bench on February 19, 2025.

On March 19, 2025, the court signed the order. The order modified the MSA as follows:

> Item 3B: In addition to that property listed in said Item 3b as being the sole and separate property of the Defendant's free and clear of any interest of the Plaintiff, the Defendant shall additionally retain as his sole and separate property his personal clothing and personal items which shall consist of the following items of property:
>
> **Clothing and Footwear** — his personal clothing, his personal shoes, and his personal accessories;
>
> **Personal Hygiene and Grooming Items** — [t]oiletries, razors, soaps, creams, lotions, cologne, and grooming tools and all of his hygiene items.
>
> **Personal Jewelry and watches** — personal jewelry, his wedding ring, and his personal watches;
>
> **Medical and Health-Related Items** — his prescription medications, his eyeglasses;
>
> **Personal Documents** — his birth certificate, his passport, his driver's license, his personal and business/financial records, and legal documents and all company records and titles.

23

> **Sentimental Items** — his childhood memorabilia, his personal albums, his personal photos of [him] and photos of [him] with [his] children.[11]

With respect to Item 5, the court ordered that:

> the parties anticipated physical separation from one another upon the sale of the Marital Home as anticipated by Item 8 of the parties' November 15, 2024 Marital Settlement Agreement shall constitute a 'material change in circumstances' as it relates to Items 5 and 6 of the parties' November 15, 2024 Marital Settlement Agreement.

The court further stated that, "except as explicitly modified," the MSA was incorporated, but not merged, in the order.

On March 24, 2025, Father filed a motion to vacate the March 19, 2025 order. Father argued that Mother rejected the list of personal property he wanted to keep and submitted the proposed order "[w]ithout giving undersigned counsel a reasonable opportunity to respond." Father also argued that the Clerk entered the order "without Defendant's ability to respond in accordance with the time proscribed by the Maryland Rules." Father further argued that the order "was inconsistent with the [c]ourt's oral ruling – that the parties would confer."

On March 25, 2025, Father filed, with a new attorney, an Amended Motion to Vacate the March 19, 2025 Order, stating that the earlier motion had been filed without his approval. In addition to claims raised in the earlier motion, Father alleged that Mother "did not have the authority to simply 'reject'" his request for his personal property, and Mother

---

[11] This list incorporated the majority of the items requested by Father under the category of personal items.

"and her counsel have operated in bad faith throughout this litigation and have refused to confer with [Father] as ordered by the judge." Father further argued that the "issues of legal and physical custody of the children was left for a later hearing," but the March 19, 2025 court order "gave legal and physical custody of the three minor children to [Mother] without any consideration for joint legal custody with [Father]." Finally, Father argued that Mother was "dissipating the parties' marital assets," and he requested restitution for the full value of his personal property that Mother took.

On March 27, 2025, the court denied Father's motion to vacate, and it ordered that the matter proceed in the divorce case. On April 4, 2025, the court denied Father's amended motion to vacate.[12]

On April 16, 2025, Father noted an appeal. In the civil appeal information report, Father's counsel stated that the date of the relevant hearing was February 19, 2025, and the issue involved on appeal was the validity of the March 19, 2025 Order.

**B.**

**APPEALABLE ORDER**

Before addressing the merits of Father's claims, we must address whether this appeal is properly before this Court. Although the parties did not address this issue in their briefs, the issue of appellate jurisdiction may be raised by the Court *sua sponte*. *Milburn v. Milburn*, 142 Md. App. 518, 522-23 (2002).

---

[12] Father has filed other motions in this case that are not the subject of this appeal. We will not address them.

Subject to certain exceptions, a party may appeal only from a final judgment rendered by the trial court. *Wash. Suburban Sanitary Comm'n v. Bowen*, 410 Md. 287, 294 (2009); *Pattison v. Pattison*, 254 Md. App. 294, 307 (2022); Md. Code Ann., Cts. & Jud. Proc. Art. ("CJ") § 12-301 (2020 Repl. Vol.). A final judgment is one that settles all the claims against all the parties. *Bowen*, 410 Md. at 294-95; *Johnson v. Johnson*, 423 Md. 602, 607 (2011). The purpose of the final judgment rule is to "'promote judicial economy and efficiency' by preventing piecemeal appeals after every order or decision by a trial court.'" *In re C.E.*, 456 Md. 209, 221 (2017) (quoting *Sigma Reprod. Health Ctr. v. State*, 297 Md. 660, 665 (1983)).

Prior to oral argument, the parties were asked to address the appealability of the circuit court's order. Mother argued that the circuit court's order upholding the MSA was a final judgment. We disagree because the divorce proceedings remain pending.

There are, however, several exceptions to the final judgment rule: (1) appeals from interlocutory orders allowed by statute; (2) immediate appeals allowed under Md. Rule 2-602; and (3) appeals allowed under the collateral order doctrine. *Pattison*, 254 Md. App. at 307; *Accord Md. Bd. of Physicians v. Geier*, 451 Md. 526, 546 (2017). The purpose of these exceptions is to "'allow appeals from orders other than final judgments when they have a final irreparable effect on the rights of the parties.'" *Pattison*, 254 Md. App. at 307 (quoting *Milburn*, 142 Md. App. at 524).

Here, an appeal from the March 19, 2025 Order is permitted under CJ § 12-303(1), which provides that a party may appeal from an "order entered with regard to the possession of property with which the action is concerned," and CJ § 12-303(3)(x), which

26

provides that a party may appeal from an order "[d]epriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order." Thus, the appeal here, to the extent it involves Father's possession of property or the care and custody of the children, is an appealable interlocutory order. We now turn to the merits of Father's arguments on appeal.

## C.

## ANALYSIS

## 1.

## March 19, 2025 Order/Validity of the MSA

Father contends that the circuit court committed error in its March 19, 2025 order for several reasons. First, he argues that the circuit court erred in "stripping [his] constitutional rights as a father" by awarding custody without considering what is in the best interest of the child. Second, Father asserts that the circuit court "committed legal error in upholding an MSA that was procedurally and substantively unconscionable." Third, Father contends that the circuit erred in issuing the order without waiting for him to respond. Fourth, he argues that the court erred because it "only asked for an Order for the personal property list and yet [the court] granted an Order that encompassed the entire MSA including custody." Fifth, Father argues that the court "erred in upholding an MSA that had a notary date that was dated a year prior to the date the agreement was signed."

Initially, we note that this Court typically will not decide issues that were not properly raised and decided by the lower court. *See* Rule 8-131(a) (an appellate court ordinarily will not decide an issue "unless it plainly appears by the record to have been

27

raised in or decided by the trial court"). *Accord Mungo v. State*, 258 Md. App. 332, 369 ("Ordinarily, an appellate court will not decide any issue 'unless it plainly appears by the record to have been raised in or decided by the trial court.'") (quoting Md. Rule 8-313(a)), *cert. denied*, 486 Md. 158 (2023).

Here, although Father raises a litany of claims on appeal, his sole request to the circuit court prior to the March 2025 order was to invalidate Items 3 and 5 of the MSA on the ground that these provisions were unconscionable. He made no argument, as he does on appeal, regarding the factors that guide the analysis of the best interest of the children in a custody case.[13] Nor did he raise any argument about the notary date. Accordingly, we will address only the preserved issue of the unconscionability of the MSA, as well as the preserved issues raised in the motions to reconsider.

Marital settlement agreements are enforceable contracts, subject to the same analysis as other contracts. *Pattison v. Pattison*, 491 Md. 551, 562 (2025). "[S]eparation agreements. . . are generally favored by the courts as a peaceful means of terminating marital strife and discord so long as they are not contrary to public policy." *Young v. Anne*

---

[13] We also note that, with respect to the argument regarding custody, which was not presented to the circuit court, at the time of the circuit court's order, the parties were living together, and Father could see the children whenever he wanted. Arguably, a ruling on the issue of custody and visitation was not ripe. *See Moore v. Md. Hemp Coal.*, No. 1590, 2025 WL 2602274, at *28 (Sept. 9, 2025) ("A claim is not yet ripe if 'it involves a request that the court declare the rights of parties upon a state of facts which has not yet arisen, or upon a matter which is future, contingent and uncertain.'") (quoting *Pizza di Joey, LLC v. Mayor of Balt.*, 470 Md. 308, 340 (2020)). The court commented on that, and it did not issue a custody ruling. Rather, it upheld the MSA and provided that, once the parties physically separated, Father could move to modify the MSA to get visitation with the children.

*Arundel Cnty.*, 146 Md. App. 526, 595 (2002) (quoting *Gordon v. Gordon*, 342 Md. 294, 301 (1996)), *cert denied*, 327 Md. 432 (2002). In that regard, courts have limited ability "to undo that which the parties fairly and voluntarily assumed, even if the agreement might be deemed impudent." *Shih Ping Li v. Tzu Lee*, 210 Md. App. 73, 102 (2013) (quoting *Martin v. Farber*, 68 Md. App. 137, 144 (1986)), *aff'd*, 437 Md. 47 (2014).

A marital settlement agreement "is valid and enforceable, unless the agreement is unconscionable or the byproduct of fraud, duress, mistake, or undue influence." *Lloyd v. Niceta*, 485 Md. 422, 443 (2023).[14] "There are two aspects of unconscionability – procedural and substantive." *Rankin v. Brinton Woods of Frankford, LLC*, 241 Md. App. 604, 621 (2019). Both elements must be present for the court to decline to enforce a contract provision. *Id.* at 621-22.

Procedural unconscionability focuses on the "process of making a contract." *Stewart v. Stewart*, 214 Md. App. 458, 477 (2013) (quoting *Walther v. Sovereign Bank*, 386 Md. 412, 427 (2005)). It includes "such devices as the use of 'fine print and convoluted or unclear language,' as well as 'deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms.'" *Id.* (quoting *Walther*, 386 Md. at 426-27 (2005)).

Substantive unconscionability "refers to contractual terms that are unreasonably or grossly favorable to the more powerful party and includes terms that attempt to alter in an

---

[14] Although Father states at one point in his brief that there was evidence of fraud in this case, this argument was not raised below. As indicated, the sole argument raised below was unconscionability.

impermissible manner fundamental duties otherwise imposed by the law." *Lloyd*, 255 Md. App. at 686 (quoting *Stewart*, 214 Md. App. at 477). A contract is substantively unconscionable if it is "so one-sided as to 'shock the conscience' of the court." *Shih Ping Li*, 210 Md. App. at 112.

Here, although Father raises both procedural and substantive unconscionability on appeal, he limited his argument below to substantive unconscionability. We will limit our analysis accordingly.

The circuit court stated that, although Item 5 of the MSA was not its preference for an agreement, the court did not find it to be unconscionable. The court's factual finding in this regard is reviewed for clear error. *Williams v. Williams*, 306 Md. 332, 338 (1986).[15] A court's findings are "not clearly erroneous if there is competent or material evidence in the record to support the court's conclusion." *Azizova v. Suleymanov*, 243 Md. App. 340, 372 (2019) (quoting *Lemley v. Lemley*, 109 Md. App. 620, 628 (1996)), *cert. denied sub nom. Suleymanov v. Azizova*, 467 Md. 693 (2020).

Based on the terms of the MSA, we conclude that the circuit court was not clearly erroneous in finding that it was not substantively unconscionable. The record demonstrates that the parties negotiated the MSA before executing the agreement, and Father proposed giving Mother full custody of the children in return for Mother waiving her right to child

---

[15] Father relies heavily on *Williams v. Williams*, 306 Md. 332 (1986). In that case, the court made a factual finding that the agreement was substantively unconscionable because it required Father to give up all interest in the children and the marital property while assuming all marital debt, which exceeded his income. *Id.* at 334 n.1, 336-38. This case is distinguishable both in the procedural posture and the factual circumstances.

and spousal support. Moreover, as the circuit court noted, Father was free to file for a modification of the MSA when he moved out of the house if he wanted more visitation with the children than Mother would allow. With respect to Item 3, the court did modify the MSA to allow Father to get personal items from the residence. There was no clear error in the court's factual findings that the MSA was not substantively unconscionable.[16]

Father next contends that the circuit court erred in its order with respect to Item 3 of the MSA because it issued the order without waiting the requisite time for him to respond. Father argues that Mother's submission of the proposed order constituted a motion, and pursuant to Rule 2-311, he had 15 days to file a response, but the court entered the order two days after the proposed order was sent. Father supplies no caselaw to support his position that Mother's Request for Order was a motion.

Mother contends that "[a]ppellee's memorandum to the court, submitted alongside the proposed order, was not a 'motion' but a ministerial act fulfilling the court's directive

---

[16] Although not raised as an issue in this appeal, we note that, pursuant to the MSA, the parties waived child support. As the Supreme Court of Maryland explained in *In the Matter of the Marriage of Houser*, however, parents generally cannot bargain away or waive a minor child's right to child support. 490 Md. 592, 608 (2025). To justify such an agreement, the parents must explain:

> [W]hy, in a guidelines case, application of the child support guidelines is unjust or inappropriate, *see* FL § 12-202(a)(2)(ii), or, in an above-guidelines case, why the desired amount of child support comports with a balancing of the minor child's best interest and the parents' ability to provide that desired level of support, *see id.* § 12-204(d).

*Id.* at 627-28. The circuit court can address this issue in the continuing divorce proceedings.

31

to reduce its bench ruling to writing." The cases Mother cites in support of this argument either do not exist or do not stand for the proposition stated.

The briefs leave us with no supporting authority on the issue presented. This Court has previously noted that "it is not this Court's responsibility to attempt to fashion coherent legal theories to support [an] appellant's sweeping claims." *Elecs. Store, Inc. v. Cellco P'ship*, 127 Md. App. 385, 405 (1999). "It is not our function to seek out the law in support of a party's appellate contentions." *Anderson v. Litzenberg*, 115 Md. App. 549, 578 (1997). When the appellant fails to cite to any authority for their position, the contention is deemed waived. *Oroian v. Allstate Ins. Co.*, 62 Md. App. 654, 658 (1985) ("Appellants, in their brief, have cited no authority for their position. We deem it waived.").

Because Father has not cited to any authority to support his argument that the proposed order submitted by Mother constituted a motion, and therefore, the court was required to wait 15 days to give Father a chance to respond before issuing the order, Father waived this contention. Accordingly, we shall not consider it.[17]

---

[17] Father also contends that the court erred in granting an order encompassing the entire MSA, including custody, when its oral ruling asked only for an order describing the list of personal property. To be sure, the court did ask the parties for an agreed upon list of personal property that Father could take from the residence, but once the court was advised that the parties could not agree, it issued an order ruling on the issues presented. It found that the MSA was not unconscionable and listed the personal property that Father could take from the premises. The order was consistent with the court's findings on the record. We perceive no error or abuse of discretion in this regard.

## 2.

## Other Motions

Father argues that the court abused its discretion in not granting him hearings on motions filed after the order at issue on appeal. Because these motions are not relevant to the appeal from the court's order upholding the MSA, we will not address any of Father's contentions in this regard.

## 3.

## Judicial Bias

Father's final contention is that he "has been denied justice at every turn" in the circuit court. In support, he again cites to proceedings that do not relate to the order on appeal and/or that appear to have occurred after the date of the notice of appeal.

To preserve a claim of judicial bias "during the course of a proceeding in which it is alleged that such conduct is detrimental to a party's case," the party must raise the issue during the hearing so that the record reflects the following four elements:

> (1) facts are set forth in reasonable detail sufficient to show the purported bias of the trial judge; (2) the facts in support of the claim must be made in the presence of opposing counsel and the judge who is the subject of the charges; (3) counsel must not be ambivalent in setting forth his or her position regarding the charges; and (4) the relief sought must be stated with particularity and clarity.

*Balt. Cotton Duck, LLC v. Ins. Comm'r of the State of Md.*, 259 Md. App. 376, 401 (2023) (quoting *Braxton v. Faber*, 91 Md. App. 391, 408-09 (1992)), *cert. denied*, 486 Md. 396 (2024).

33

"[T]here is a strong presumption in Maryland . . .and elsewhere . . . that judges are impartial participants in the legal process." *Jefferson-El v. State*, 330 Md. 99, 107 (1993). The party seeking recusal has a heavy burden to overcome the presumption of judicial impartiality. *Bishop v. State*, 218 Md. App. 472, 491 (2014), *cert. denied*, 414 Md. 218 (2015).

Here, Father did not raise any claim of judicial bias in the proceedings subject to this appeal. Father, therefore, has not preserved any issue of judicial bias for this Court's review.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**